2001–NMSC–017

25 P.3d 225

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Candelario CARDENAS–ALVAREZ, Defendant–Respondent.**

No. 26,130.

Supreme Court of New Mexico.

April 30, 2001.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Phyllis H. Subin, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Respondent.

Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, P.A., Scott M. Davidson, Albuquerque, NM, Jones, Snead, Wertheim, Wentworth & Jaramillo, P.A., Jerry Todd Wertheim, Santa Fe, NM, for Amicus Curiae New Mexico Criminal Defense Lawyers Association.

## OPINION

FRANCHINI, Justice.

{1} On September 6, 1997, a federal agent at a permanent border patrol checkpoint more than sixty miles north of the Mexican border seized eighty-five pounds of marijuana from Defendant. At trial in state court, Defendant moved to suppress the evidence based on the federal agent's alleged violation of the United States and New Mexico Constitutions. The trial court denied the motion. A two-judge majority of the Court of Appeals reversed the trial court, holding that the federal agent unlawfully extended Defendant's detention. We granted certiorari to review that holding. We hold: (1) the federal agent did not violate the federal Constitution; (2) the New Mexico Constitution and laws apply to evidence seized by federal agents at a border patrol checkpoint sixty miles within the State of New Mexico when that evidence is proffered in state court; (3) the federal agent violated the New Mexico Constitution; and (4) the evidence thereby seized must be excluded in state court. We reverse Defendant's conviction.

## I.

{2} On the date in question, federal agent Hector Arredondo had been employed as a border patrol agent on the U.S.-Mexico border for approximately two-and-one-half months. At about 7:45 p.m., Candelario Cardenas–Alvarez, driving a pick-up with Mexican plates, reached Agent Arredondo's primary station at a permanent checkpoint more than sixty miles north of the border. When asked for identification, Defendant produced a resident alien identification card. After inspecting Defendant's documents, Agent Arredondo began to ask Defendant about the origin, destination and purpose of his trip. Defendant stated that he was on his way from El Paso to Albuquerque to pick up a vehicle that he had already purchased. He said that he borrowed the vehicle he was driving from a friend.

{3} Agent Arredondo considered it suspicious that Defendant was driving at this time, since the late hour would cause Defendant to incur additional expenses for food and lodging. After having towed vehicles for a living for seven years prior to becoming a federal agent, Agent Arredondo thought it was strange that Defendant had not brought a second person to help tow the vehicle. Nor did Defendant appear to have a tow bar or tools other than those that might have fit in the small tool box that Agent Arredondo observed in the cab. Agent Arredondo also had suspicions concerning Defendant's decision to follow a longer, less popular highway, rather than taking Interstate 25 to Albuquerque. Finally, Agent Arredondo thought it suspicious that Defendant was driving a vehicle with Mexican plates even though he was a resident alien. Agent Arredondo ordered Defendant to a secondary inspection area.

{4} At the secondary inspection area, Agent Arredondo asked for and obtained Defendant's consent to search the vehicle. That search revealed fresh scratch marks on the bolts attached to the gas tank. Agent Arredondo then asked for and obtained Defendant's consent to conduct a canine inspection of the truck. The dog alerted to the gas tank, and a visual inspection revealed that it contained an internal tank. The agent arrested Defendant and advised him of his rights. Federal agents later dismantled the vehicle and discovered some eighty-five pounds of marijuana within the internal tank.

{5} At trial in state court, Defendant moved to suppress the evidence on the

ground that Agent Arredondo lacked the reasonable suspicion of criminal activity required to detain Defendant beyond the initial questioning. The trial judge denied the motion to suppress based on her conclusion that Defendant's responses to Agent Arredondo's questions raised reasonable suspicion. After a jury trial, Defendant was found guilty of possession of marijuana with intent to distribute. The Court of Appeals reversed the conviction, holding that the extended detention of Defendant was unlawful. *See State v. Cardenas–Alvarez,* 2000–NMCA–009, 128 N.M. 570, 995 P.2d 492. We granted certiorari, and now affirm the Court of Appeals. We hold that although Agent Arredondo did not violate the United States Constitution, he did violate Article II, Section 10 of the New Mexico Constitution. The evidence obtained by Agent Arredondo must therefore be suppressed in state court.

## II.

{6} The constitutionality of a search or seizure is a mixed question of law and fact and demands de novo review. *See State v. Attaway,* 117 N.M. 141, 145, 870 P.2d 103, 107 (1994); *State v. Hernandez,* 1997–NMCA–006, ¶ 18, 122 N.M. 809, 932 P.2d 499. Defendant claims that the search and seizure conducted by Agent Arredondo violated his rights under both federal and state constitutions. For reasons set forth below, we reject Defendant's claim that the search and seizure violated his rights under the federal Constitution. In addressing his state constitutional claim, we employ the interstitial analysis adopted in *State v. Gomez,* 1997–NMSC–006, ¶¶ 19–22, 122 N.M. 777, 932 P.2d 1. Pursuant to *Gomez,* we ask: (1) whether the right being asserted is protected under the federal Constitution; (2) whether the state constitutional claim has been preserved; and (3) whether there exists one of three reasons for diverging from federal precedent. *Id.*

## A. WHETHER THE RIGHT IS PROTECTED BY THE FEDERAL CONSTITUTION

{7} If the federal Constitution affords Defendant the protection he seeks, we will not examine his state constitutional claim. *See Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. Here, Defendant seeks protection from the extension of his detention at a border checkpoint stop when the officer conducting the detention allegedly lacked reasonable suspicion of criminal activity. In *Cardenas–Alvarez,* the two-judge majority recognized that unlike New Mexico courts, which demand "reasonable suspicion" to extend a detention beyond routine questions, the Tenth Circuit requires mere "suspicious circumstances." 2000–NMCA–009, ¶ 14, 128 N.M. 570, 995 P.2d 492 (comparing *State v. Galloway,* 116 N.M. 8, 9, 859 P.2d 476, 477 (Ct.App.1993) with *United States v. Chavira,* 9 F.3d 888, 889 (10th Cir.1993)). The Court of Appeals held Defendant's extended detention unconstitutional because "the facts known to the Border Patrol agents [do not meet] what we have assumed to be the lower Tenth Circuit standard of suspicious circumstances." *Cardenas–Alvarez,* 2000–NMCA–009, ¶ 18, 128 N.M. 570, 995 P.2d 492. The State argues that this holding "rests on a misunderstanding of federal border search law." We agree. Under federal law, Defendant's detention constituted a routine border checkpoint stop and therefore need not have been supported by suspicious circumstances.

{8} Federal courts have rendered the referral of a motorist from primary to secondary legally immaterial; a Border Patrol agent need not observe suspicious circumstances to make such a referral so long as the detention is permissible in scope and duration. *See United States v. Ludlow,* 992 F.2d 260, 263–64 (10th Cir.1993) (holding that "Border Patrol agents have virtually unlimited discretion to selectively refer cars to the secondary inspection area. Thus a routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate."); *United States v. Sanders,* 937 F.2d 1495, 1499–1500 (10th Cir.1991) (holding that suspicious circumstances are not required to justify the referral of an individual to a secondary inspection station); *see also United States v. Pinedo–Montoya,* 966 F.2d 591, 593–94 (10th

Cir.1992) (holding that reasonable suspicion is required to detain a motorist and to conduct more than a routine stop, but referral of the accused to secondary detention was routine and constitutionally insignificant).

■ {9} Under federal law, Defendant's detention was not excessive in scope or duration. Defendant does not allege, nor does the record suggest, that he was detained for an impermissibly long period of time. With regard to the scope of the detention, federal courts have held that a routine stop may include more than questions regarding citizenship and immigration. "[A] few brief questions concerning such things as vehicle ownership, cargo, destination and travel plans may be appropriate [at a routine checkpoint stop] if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband." *U.S. v. Rascon–Ortiz*, 994 F.2d 749, 752 (10th Cir.1993); *see also United States v. Massie*, 65 F.3d 843, 848 (10th Cir.1995) (same); *United States v. Chavira*, 9 F.3d 888, 889 (10th Cir.1993) (same).[1] As demonstrated above, such a routine stop may be conducted at primary or secondary inspection areas without suspicious circumstances. Here, because Agent Arredondo's questions concerned Defendant's travel plans and were reasonably related to his duty to prevent the smuggling of contraband (in this case narcotics) they fell within the routine scope of inquiry allowed under the federal Constitution.

■ {10} Because federal law does not protect the right asserted by Defendant, Defendant's consent to submit to a search of his vehicle was not tainted, under federal law, by any unlawful police conduct. Nor do we find merit in Defendant's suggestion that his consent was involuntary under federal law, or that the dismantling of the vehicle exceeded the scope of his consent. Under federal law the dismantling of a vehicle is generally found to be reasonable and within the parameters of a general consent. *See United States v. Pena*, 920 F.2d 1509, 1514–15 (10th Cir.1990) (holding that a search that included removing a panel from the car door was within the scope of the defendant's consent to "look" in his car). The agents in the present case did not dismantle the vehicle until after they substantiated the presence of narcotics within the body of the vehicle by carrying out a canine search to which Defendant had also consented. *See United States v. Santurio*, 29 F.3d 550, 553 (10th Cir.1994) (holding that the removal of screws that fastened a strip of carpet covering a metal compartment containing cocaine did not exceed the scope of the defendant's consent to search, especially since the officer did not "enter the compartment until the drug detection dog alerted to the presence of narcotics."). Under federal law, the dismantling of Defendant's vehicle in order to access the inner compartment of the gas tank did not exceed the scope of Defendant's consent. Because the protections sought by Defendant are not cognizable un-

1. We recognize that, notwithstanding these cases, our Court of Appeals has held that federal law restricts a "routine" border checkpoint to questions regarding citizenship. *See Galloway*, 116 N.M. at 9, 859 P.2d at 477; *State v. Affsprung*, 115 N.M. 546, 548–49, 854 P.2d 873, 875–76 (Ct.App.1993); *State v. Estrada*, 111 N.M. 798, 799, 810 P.2d 817, 818 (Ct.App.1991). Chief Justice Serna suggests that *Estrada* represents the correct federal approach to border checkpoints, and that the present case may be resolved on federal grounds without analyzing the state constitution. C.J. Serna's Special Concurrence, ¶¶ 61–63. We disagree. While our Court of Appeals' cases represent a sound approach to border checkpoints under the New Mexico Constitution, we believe that in light of *Rascon–Ortiz, Massie* and *Chavira*, they misinterpret the federal law they purport to apply. In arguing that federal law protects the Defendant's

right, the Chief Justice also relies on *U.S. v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), which is silent on the permissible scope of a border checkpoint stop, and *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 457, 148 L.Ed.2d 333 (2000), which did not involve a border checkpoint stop and did "nothing to alter the constitutional status of the ... border checkpoints that [the Supreme Court] approved in ... *Martinez–Fuerte*." We do not believe that these Supreme Court cases limit the scope of a routine border checkpoint to questions regarding citizenship. Even if *Edmond* did, as the Chief Justice suggests, place the scope of a routine border checkpoint stop "in some doubt", C.J. Serna's Special Concurrence, ¶ 59, we believe that such doubt would compel, rather than foreclose, our examination of state constitutional law.

der the federal Constitution, we now examine Defendant's state constitutional claim.

## B. PRESERVATION

{11} We begin our examination of Defendant's state constitutional claim by determining whether Defendant properly preserved it. Under *Gomez,* our analysis of whether a state constitutional claim has been preserved depends on how our precedent treats the constitutional provision in question. 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1. If there is no precedent construing the state constitutional provision more broadly than its federal analog the defendant must assert at trial that the state constitution should be interpreted more broadly and provide reasons for the requested departure. *Id.* ¶ 23. If, on the other hand, there exists "established precedent" demonstrating that our interpretation of the New Mexico Constitution departs from federal constitutional law, we require less of the defendant to preserve his claim. *See id.* ¶ 22. If such state precedent exists, the defendant preserves his claim by: "(1) asserting the constitutional principle that provides the protection sought under the New Mexico Constitution, and (2) showing the factual basis needed for the trial court to rule on the issue." *Id.*

{12} Defendant alleges that his detention was impermissibly extended without reasonable suspicion of criminal activity. This claim is governed by Article II, Section 10 of the New Mexico Constitution. As recognized in *Gomez,* although the language of this section closely resembles its federal analog, "[t]here is established New Mexico law interpreting Article II, Section 10 more expansively than the Fourth Amendment." *Id.* ¶ 24 (citing *Campos v. State,* 117 N.M. 155, 870 P.2d 117 (1994)). *See also Attaway,* 117 N.M. at 147–50, 870 P.2d at 109–12 (recognizing that "knock and announce" rule, while not compelled under federal law, is required by Article II, Section 10 of the New Mexico Constitution); *State v. Gutierrez,* 116 N.M. 431, 447, 863 P.2d 1052, 1068 (1993) (holding that "the good-faith exception to the federal exclusionary rule is incompatible with the constitutional protection found under Article

II, Section 10...."); *State v. Cordova,* 109 N.M. 211, 217, 784 P.2d 30, 36 (1989) (concluding that New Mexico's test for determining probable cause "better effectuate[s] the principles behind Article II, Section 10 of our Constitution than does the [federal] 'totality of the circumstances' test."). Because established state precedent treats our state search and seizure provision more expansively than the Fourth Amendment, we apply the less restrictive test for preservation. Accordingly, we ask whether Defendant asserted the state constitutional principle that provides the protection he seeks and whether he provided a factual basis upon which the trial court could rule on the issue.

{13} Counsel for Defendant remarked in his closing statement at the suppression hearing that "[p]articularly in search and seizure law within New Mexico ... the appellate courts are saying that our constitution gives greater rights than the federal constitution does." While Defendant failed to specify the article and section number of the relevant constitutional provision, he clearly alerted the court to the constitutional principle (the prohibition against unreasonable searches and seizures) under which he sought protection. The trial court was also provided with the factual basis necessary to rule on the issue. The State asked Agent Arredondo about the questions he asked Defendant and the facts that allegedly aroused his suspicion. Defendant's cross-examination of Agent Arredondo and closing statement directly addressed the reasonableness of that suspicion. The trial court then ruled on the issue. We hold that Defendant's state constitutional claim was preserved.

## C. REASONS FOR DEPARTING FROM FEDERAL PRECEDENT

{14} Under *Gomez,* a state court may diverge from federal precedent for one of the following three reasons: "a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (internal citations omitted). We do not find flaw in the federal analysis, nor do we detect structural differences between state and federal gov-

ernment that warrant departure from federal precedent. Our examination of New Mexico law, however, does reveal distinctive characteristics that command our departure from federal law governing border checkpoint detentions.

{15} In *Gomez*, we expanded the protection afforded New Mexico's motorists from unreasonable searches and seizures. *See id.* ¶¶ 36–44. The *Gomez* Court questioned whether we should adopt the federal automobile exception to the warrant requirement. *See id.* The Court recognized that this exception, which would allow law enforcement officials to search vehicles without warrants so long as they have probable cause, was based, in part, on the notion that a motorist has a lesser expectation of privacy in an automobile. *See Gomez*, 1997–NMSC–006, ¶ 37, 122 N.M. 777, 932 P.2d 1. In rejecting the federal automobile exception to the warrant requirement, this Court dismissed the notion that an individual lowers his expectation of privacy when he enters an automobile, and elected instead to provide motorists with a "layer of protection" from unreasonable searches and seizures that is unavailable at the federal level. *Id.* ¶ 38. *Gomez* confirms that New Mexico courts interpret Article II, Section 10 of the state constitution more broadly than its federal counterpart, and specifically applies that broader protection to motorists. The extra layer of protection from unreasonable searches and seizures involving automobiles is a distinct characteristic of New Mexico constitutional law.

{16} In a series of pre-*Gomez* cases interpreting the Fourth Amendment, our Court of Appeals defined a "routine" border checkpoint in a way that permits less of an intrusion than we believe federal law allows. In *Galloway*, for example, we examined a border checkpoint stop at which the Border Patrol agent, after inquiring about the defendants' citizenship, proceeded to ask additional questions regarding their travel plans, and referred them to secondary. 116 N.M. at 9, 859 P.2d at 477. Unlike the Tenth Circuit, which considers questions regarding travel plans and the referral of a defendant from primary to secondary part of a routine border checkpoint stop that requires no sus-

picion of criminal activity, the *Galloway* Court sought to determine whether the agent "had reasonable suspicion to prolong the detention at the primary area to ask about the nature of the trip and to refer the vehicle to the secondary area based on the answers he received." *Id. See also Affsprung*, 115 N.M. at 548–49, 854 P.2d at 875–76 (requiring reasonable suspicion to justify a Border Patrol agent's inquiry into the ownership of the defendant's vehicle and his travel plans); *Estrada*, 111 N.M. at 799, 810 P.2d at 818 ("[I]f the issues of residence or citizenship are resolved at the primary area of the checkpoint, referral of a vehicle to the secondary area must be based on at least reasonable suspicion of wrongdoing."); *cf. State v. Guzman*, 118 N.M. 113, 114–15, 879 P.2d 114, 115–16 (Ct.App.1994) (determining whether or not a Border Patrol agent's questions regarding the defendant's travel plans and vehicle ownership were supported by reasonable suspicion); *State v. Porras–Fuerte*, 119 N.M. 180, 184, 889 P.2d 215, 219 (Ct.App. 1994) (treating the second detention of a vehicle that had already left a border checkpoint as a secondary stop, and holding that "reasonable suspicion remains the standard by which we judge these second stops."). Although *Galloway*, *Affsprung*, and *Estrada* conflict with the lesser degree of privacy that federal courts afford motorists and the prevailing Tenth Circuit approach to border checkpoints, these cases are consistent with the extra layer of protection that New Mexico offers its motorists. Therefore, in New Mexico, we continue to proscribe the prolongation of a border checkpoint stop once questions regarding citizenship and immigration status have been answered, unless the officer conducting the stop reasonably suspects the defendant of criminal activity. Traffic congestion may require the referral of a motorist from primary to secondary without offending this rule, *see Estrada*, 111 N.M. at 800, 810 P.2d at 819, however, no such congestion was present in this case. We now consider whether our state search and seizure jurisprudence applies to the case at bar.

## III.

{17} The State argues that New Mexico's requirement that reasonable suspi-

cion justify a prolonged border checkpoint stop cannot apply to federal agents. The State suggests that federal agents are not subject to state constitutions, and that their alleged non-compliance with the New Mexico Constitution, like the non-compliance of a private actor, does not affect the admissibility of evidence in a New Mexico court. The exclusionary rule requires suppression of the fruits of searches and seizures conducted in violation of the New Mexico Constitution. *See Gutierrez,* 116 N.M. at 444–47, 863 P.2d at 1065–68. If, as the State argues, federal agents are incapable of violating a state constitution, the exclusionary rule would not be activated, and the evidence would be admissible. We therefore consider whether the actions of federal agents can implicate the protections of the New Mexico Constitution for purposes of determining the admissibility of evidence in state court.

{18} Article II, Section 10 of the New Mexico Constitution provides, "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures...." In *Gutierrez,* we stated that this clause is an expression of "the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusion." 116 N.M. at 444, 863 P.2d at 1065. The Court emphasized that the purpose of the exclusionary rule is not to deter or ensure judicial integrity, but to "effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." *Id.* at 446, 865, 863 P.2d 1052. We find no mandate in the text of Article II, Section 10, nor in our jurisprudence interpreting this clause, to selectively protect New Mexico's inhabitants from intrusions committed by state but not federal governmental actors. Nor do we believe such a limitation is appropriate. Unlike the private actors with whom the State compares them, federal agents exercise jurisdiction over New Mexicans and possess the authority to systematically subject our inhabitants to searches, seizures and other interferences. A federal agent who wields these powers unreasonably commits precisely the sort of "unwarranted governmental intrusion" against which the New Mexico Constitution ensures. We hold that

when a federal agent effectuates such an intrusion and the State proffers the evidence thereby seized in state court, we will subject it to New Mexico's exclusionary rule. *See State v. Snyder,* 1998–NMCA–166, ¶ 11, 126 N.M. 168, 967 P.2d 843 (applying the exclusionary rule to the use, in a New Mexico state court, of evidence seized in New Mexico by federal Border Patrol agents in violation of the New Mexico Constitution); *State v. Davis,* 313 Or. 246, 834 P.2d 1008, 1012 (1992) (holding that given the emphasis placed on individual rights by the Oregon Constitution, Oregon's search and seizure provision applies no matter *"where* that evidence was obtained (in-state or out-of-state), or *what* governmental entity (local, state, federal, or out-of-state) obtained it...."); *State v. Williams,* 94 Wash.2d 531, 617 P.2d 1012, 1017–18 (1980) (concluding that the Washington Privacy Act "fully applies to evidence proffered in state court, even when that evidence was gathered by federal peace officers."); *cf. Wilson v. Schnettler,* 365 U.S. 381, 391, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961) (Douglas, J., dissenting) ("In the state trial the issue will not be whether the federal agents have acted within the limits of their federal authority, but whether, under the state constitution, the search was a reasonable one."); *but see State v. Mollica,* 114 N.J. 329, 554 A.2d 1315, 1327 (1989) (refusing to apply the New Jersey Constitution to the actions of federal officers because such application "would disserve the principles of federalism and comity, without properly advancing legitimate state interests.").

{19} Justice Baca suggests that by applying state law to the evidence seized by Agent Arredondo, we risk "making illegal what federal law makes legal for federal agents." J. Baca's Special Concurrence, ¶ 30. We do not pretend to possess such authority. Our application of state constitutional standards to determine the admissibility in state court of evidence seized by federal agents will not affect any prosecution that might be brought against Defendant in federal court, or otherwise circumscribe federal activities within our borders. *See, e.g., United States v. Wright,* 16 F.3d 1429, 1434 (6th Cir.1994) ("[T]he state may exclude evidence in trials

that would not be excluded by application of the Fourth Amendment. However, the state rule does not have to be applied in federal court."); *United States v. Pforzheimer*, 826 F.2d 200, 203 (2d Cir.1987) (refusing to apply state exclusionary rule in federal court); *United States v. Rose*, 806 F.2d 931, 932 (9th Cir.1986) ("The fact that Oregon sees fit to provide broader immunity is irrelevant where the question arises in federal court in response to a federal charge."). We acknowledge the supremacy of the federal government and encourage federal agents to continue to enforce the law in as vigilant a manner as the federal Constitution permits. When such vigilance violates the protections guaranteed by our state constitution, however, we will not abandon our guard of those protections in order to accommodate evidence thereby yielded. Although we do not claim the authority to constrain the activities of federal agents, we do possess the authority-and indeed the duty-to insulate our courts from evidence seized in contravention of our state's constitution.[2]

## IV.

{20} The above analysis establishes that our state constitution applies to evidence seized by federal agents when the State seeks to admit that evidence in state court. Our interpretation of the New Mexico Constitution demands that after a Border Patrol agent has asked about a motorist's citizenship and immigration status, and has reviewed the motorist's documents, any further detention requires reasonable suspicion of criminal activity. *See Galloway*, 116 N.M. at 9, 859 P.2d at 477; *Affsprung*, 115 N.M. at 548–49, 854 P.2d at 875–76; *Estrada*, 111 N.M. at 799, 810 P.2d at 818. Agent Arredondo prolonged Defendant's detention by asking him additional questions and referring him to secondary. We now question whether Agent Arredondo possessed the requisite reasonable suspicion.

{21} In determining whether reasonable suspicion exists, we examine the totality of the circumstances. *See Affsprung*, 115 N.M. at 549, 854 P.2d at 876. "Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts." *State v. Flores*, 1996–NMCA–059, ¶ 7, 122 N.M. 84, 920 P.2d 1038. Agent Arredondo offered no justification for his decision to ask Defendant additional questions after the issue of immigration had been resolved. The only reasons he offered for his decision to refer Defendant to secondary were that "all the facts he was telling me [were suspicious]" and that Defendant's account of what he was doing "was not very reasonable." This testimony does not amount to specific facts from which an inference of criminal activity could possibly be drawn. Moreover, after reviewing the record in its entirety, we agree with the Court

---

2. We believe that our decision to apply New Mexico's exclusionary rule to evidence seized by federal agents in violation of the New Mexico Constitution and proffered in state court will have precisely the same limited impact on the federal government as would Justice Baca's contention that "because the evidence in this case was obtained by federal agents, the New Mexico Constitution determines the admissibility of the evidence in state court." J. Baca's Special Concurrence, ¶ 46. While we find state action in the federal agent's prolonged detention of Defendant, however, Justice Baca instead argues that "state action occurred when the State filed charges against the Defendant and sought to use and did, in fact, use the evidence in a New Mexico prosecution." J. Baca's Special Concurrence, ¶ 45. We have encountered no legal authority for this version of state action. Normally, in order to find state action in the prosecutor's use of evidence, there must be a showing of agency between the party who obtained the evidence and the party using it. *See, e.g., Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Here, the federal government was not acting as agent of the State. Moreover, according to Justice Baca, the source of the constitutional violation (a necessary ingredient to the imposition of the exclusionary rule) lies not in the action of the state prosecutors, but in the idea that, "Since the evidence obtained as a result of the prolonged seizure of the Defendant and subsequent search of his vehicle would be unlawful under Article II, Section 10 of the New Mexico Constitution had state officials conducted the search, our exclusionary rule prohibits the use of such evidence in a New Mexico state court." J. Baca's Special Concurrence, ¶ 57. Even according to this questionable interpretation of the exclusionary rule, the state actors (New Mexico prosecutors) are not responsible for the constitutionally offensive action (the prolonged seizure of Defendant). We doubt that the exclusionary rule can be properly imposed upon such grounds.

of Appeals that the facts that Agent Arredondo observed could not possibly have amounted to reasonable suspicion. *See Cardenas–Alvarez,* ¶ 17. Defendant was driving a friend's pickup, with Mexican plates, along an alternate route from El Paso to Albuquerque at 7:45 in the evening. The fact that he had neither a companion nor a tow bar is not inconsistent with his stated purpose of picking up a vehicle that belonged to him because he could have been meeting a companion or picking up a tow bar in Albuquerque. We agree with the Court of Appeals that none of these facts, taken alone or together, "indicate a sinister motive" or otherwise raise reasonable suspicion. *See id.* We therefore hold that Agent Arredondo violated the New Mexico Constitution when he prolonged Defendant's detention without reasonable suspicion. Because we determine that Defendant's detention was unconstitutional we need not reach his state constitutional claim that the ensuing search exceeded the scope of his consent.

### V.

{22} Having determined that the New Mexico Constitution applies to the evidence seized by Agent Arredondo, and that the prolonged detention violated the New Mexico Constitution, we must now determine whether the evidence must be suppressed. As discussed above, the exclusionary rule requires the suppression of the fruits of an unconstitutional search and seizure. *See Gutierrez,* 116 N.M. at 444–47, 863 P.2d at 1065–68. A defendant's consent to a search following an unconstitutional search and seizure may sanitize the evidence and exempt it from the exclusionary rule if there exists a sufficient causal break between the illegal conduct and the consent. *See State v. Bedolla,* 111 N.M. 448, 455–56, 806 P.2d 588, 593–94 (Ct.App.1991). Here, Defendant's consent was tainted by the unlawfully prolonged detention that immediately preceded it. That taint was never purged by a causal, or even temporal, break in the chain of events that led from the unconstitutional seizure to the consent to search. All evidence thereby seized is therefore inadmissible in New Mexico state courts.

### VI.

{23} Defendant's conviction is reversed.

{24} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, Justice, PETRA JIMENEZ MAES, Justice.

PATRICIO M. SERNA, Chief Justice (specially concurring).

JOSEPH F. BACA, Justice (specially concurring).

BACA, Justice (concurring in the result).

{25} I agree with the majority's conclusion that the evidence obtained as a result of the continued seizure of the Defendant at the border patrol checkpoint and subsequent search of his automobile is inadmissible in state court. Although I concur in the result, I do not concur in the majority's reasoning. Primarily, I respectfully disagree that federal agents are subject to the provisions of the New Mexico Constitution. *See* Majority Opinion, ¶¶ 1, 5, 18, 21. By premising its analysis on the conclusion that the federal agent violated Article II, Section 10 of the New Mexico Constitution, I fear that the majority leads this Court into dangerous territory by interrupting the delicate balance between federal and state power. Consequently, I am concerned that such broad reasoning will undermine this Court's decision in *State v. Gomez,* 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1. Moreover, given the complex "New Federalism" issues raised by this case and the Court of Appeals' imprecise application of the interstitial approach adopted by this Court in *Gomez,* this Court has an obligation to provide a clear and concise framework for analyzing federal and state constitutional issues. Accordingly, I write separately to explain my concerns with the majority opinion and to attempt to fully analyze this complex and controversial area of law.

### I.

{26} The majority holds that the evidence in this case is inadmissible in state court pursuant to the New Mexico Constitution.

The majority supports this holding by concluding that federal border patrol agent Arredondo violated Article II, Section 10 of the New Mexico Constitution when he prolonged the Defendant's detention without reasonable suspicion. *See* Majority Opinion, ¶ 21. In reaching this conclusion, the majority has promulgated new law in New Mexico with little justification. Essentially, they have expanded the state action requirement of Article II, Section 10 to encompass the actions of federal agents who exercise federal authority within the boundaries of a permanent border patrol checkpoint—a wholly federal enclave. I question the majority's authority to pronounce such a broad rule, particularly in the face of such compelling issues of federal supremacy.

{27} The New Mexico Constitution does not apply to federal agents and, as such, the federal agent in this case could not have violated Article II, Section 10 of the New Mexico Constitution. "Constitutions provide the framework to 'constitute' a government." *State v. Snyder*, 1998–NMCA–166, ¶ 28, 126 N.M. 168, 967 P.2d 843 (Hartz, C.J., specially concurring); *see also Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("The Constitution created a Federal Government of limited powers."); *Jaksha v. State*, 241 Neb. 106, 486 N.W.2d 858, 863 (1992) ("A state constitution is the supreme written will of the people of a state regarding the framework for their government and is subject only to the limitations found in the federal Constitution."). The provisions of a constitution, therefore, relate only to the sovereign government that is the subject of that constitution, and a Bill of Rights provision contained within a state constitution serves to "protect against abuse of power by that sovereign." *Snyder*, 1998–NMCA–166, ¶ 28, 126 N.M. 168, 967 P.2d 843, (Hartz, C.J., specially concurring); *see also Barron v. Mayor of Baltimore*, 32 U.S.(7 Pet.) 243, 247, 8 L.Ed. 672 (1833)

("[T]he limitations on power, if expressed in general terms, are naturally . . . applicable to the government created by the instrument. They are limitations of power granted in the instrument itself; not of distinct governments, framed by different persons and for different purposes."). For example, the provisions of the Fourth Amendment to the United States Constitution, which applies only to the federal government, ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The federal prohibition against unlawful searches and seizures is enforceable against the states only through the Due Process Clause of the Fourteenth Amendment which provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law." [1] U.S. Const. amend. XIV, § 1; *see also Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ("Since the Fourth Amendment's right to privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government."). Similarly, the state prohibition against unlawful searches and seizures cannot reach federal conduct absent a comparable provision found within the state constitution. *See, e.g., State v. Mollica*, 114 N.J. 329, 554 A.2d 1315, 1327 (1989) ("Stated simply, state constitutions do not control federal action."). Because the New Mexico Constitution neither has nor can have a provision comparable to the Due Process Clause of the Fourteenth Amendment, the State has no method to extend the reach of Article II, Section 10, to federal action.

{28} Additionally, the authority cited by the majority does not support the proposition that federal agents are subject to the mandates of state constitutions. As support for

---

1. Federal constitutional jurisprudence as it applies to state action underwent a long and arduous development. The United States Supreme Court struggled for nearly fifty years attempting to define and justify the scope of the Fourth Amendment and the exclusionary rule as it applied to the states through the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 646–54, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Despite the complexity of analyzing the scope of power of each sovereign in a dual sovereign nation and delicately balancing such power pursuant to notions of federalism, the majority concludes with little justification or authority that the New Mexico Constitution applies to federal agents.

its conclusion, the majority cites *Snyder*, 1998–NMCA–166, ¶ 11, 126 N.M. 168, 967 P.2d 843, and *State v. Davis*, 313 Or. 246, 834 P.2d 1008, 1012 (Or.1992). *See* Majority Opinion, ¶ 18. These cases, I submit, do not stand for the proposition that federal agents are subject to state constitutions and laws. To the contrary, both opinions go to great lengths to clarify that they do not intend to apply their state constitution to federal or foreign agents. For instance, in *Snyder*, Judge Armijo, writing for the majority and citing the federal and state supremacy clauses, stated, "We agree that state law generally does not govern the conduct of federal agents." 1998–NMCA–166, ¶ 10, 126 N.M. 168, 967 P.2d 843. Instead, the *Snyder* decision is based on the fact that the evidence obtained is being used in a state court by the state prosecution.

> [T]he question arises *in a New Mexico state court in response to the State's prosecution of Defendant for violating one of New Mexico's criminal statutes*. We determine that the State's ability to use the evidence at issue in this case in the courts of the State of New Mexico is governed by the exclusionary rule under Article II, Section 10 of the New Mexico Constitution.

*Id.* ¶ 11 (emphasis added). Similarly, in *Davis* the Oregon Supreme Court held:

> If the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9, of the Oregon Constitution. It does not matter *where* that evidence was obtained (in-state or out-of-state), or *what* governmental entity (local, state, federal, or out-of-state) obtained it; *the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution*. Where that is true, the Oregon constitutional protections apply.

834 P.2d at 1012–13 (third emphasis added). The holding of *Davis* is distorted by omitting

that the Oregon Supreme Court's decision was based on *"the constitutionally significant fact ... that the Oregon government seeks to use the evidence in an Oregon criminal prosecution." Id.* (emphasis added); *see* Majority Opinion, ¶ 18. Contrary to the majority's characterization of *Snyder* and *Davis*, the courts in both cases do not impose the mandates of their state constitution on federal or foreign agents; instead, they focus on the state actors that are seeking to introduce the evidence seized and the forum where the evidence is sought to be used. Therefore, these cases provide no authority for the majority's holding.

{29} Moreover, I have found no federal precedent that allows the provisions of a state constitution to apply to federal action and, in fact, such a holding violates principles of federalism and federal supremacy. The United States Supreme Court, for example, has expressed a limitation on state power in controlling federal action in the context of a civil action. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens*, the Supreme Court stated that "just as state law may not authorize federal agents to violate the Fourth Amendment [citations omitted], neither may state law undertake to limit the extent to which federal authority can be exercised." *Id.* "In its sphere of activity the federal law is sovereign, and insofar as it establishes minimum standards it is paramount." Barry Latzer, *The New Judicial Federalism and Criminal Justice: Two Problems and a Response*, 22 Rutgers L.J. 863, 884 (1991). As stated by the majority, the federal agents in this case acted in conformity with the federal Constitution and therefore did not violate federal law. *See* Majority Opinion, ¶¶ 5, 9. By mandating that the federal agents also conform to Article II, Section 10 of the New Mexico Constitution, however, the majority is making illegal what federal law makes legal for federal agents. Such a result may violate the Supremacy Clauses of both the United States and New Mexico Constitutions.[2] *See*

---

**2.** I agree with the Defendant that the Supremacy Clause does not prohibit state law from providing greater protection for individual rights than does federal law. *See generally Gomez*, 1997–

NMSC–006, 122 N.M. 777, 932 P.2d 1. The Supremacy Clause may be triggered, however, when states seek to control federal action. *See* Latzer, *supra*, at 876 (recognizing that the su-

U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby...."); N.M. Const. art. II, § 1 ("The state of New Mexico is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land."). Finally, the State of New Mexico has no power to enforce violations of Article II, Section 10 against federal officers. *See Snyder*, 1998–NMCA–166, ¶ 32, 126 N.M. 168, 967 P.2d 843 (Hartz, C.J., specially concurring) ("[I]t is highly unlikely that federal officers would change their conduct to comply with state laws.").

{30} The majority simply disregards any potential supremacy or federalism issues raised by the extension of the New Mexico Constitution to federal action by asserting that applying state constitutional standards to federal action, "will not affect any prosecution that might be brought against Defendant in federal court, or otherwise circumscribe federal activities within our borders." Majority Opinion, ¶ 19. However, despite the majority's contentions that their holding will only affect the exclusion of evidence seized by federal agents in New Mexico courts, the majority is not merely promulgating a rule of evidence, but creating a state constitutional right. Simply because the majority cannot articulate a cognizable consequence of applying the state constitution to federal action, does not excuse the fact that the majority is infringing upon federal sovereignty. Individuals now have a fundamental right under Article II, Section 10, to be free from unreasonable search and seizure by state, as well as, federal officials. Federal agents who do not abide by the mandates of Article II, Section 10, violate the fundamental substantive rights of the individual who passes through the border patrol checkpoint. Therefore, although the majority claims that it does not "pretend to possess [the] authority" to make illegal what federal law makes legal, they are, in fact, doing just that. Majority Opinion, ¶ 19.

premacy of federal law might bar application of the state constitution to agents working for the

{31} Additionally, the majority assumes that there will be no other consequences for a violation of these fundamental rights other than suppression of the evidence in state court. Under this analysis, the majority dismisses the possibility of a civil remedy that may be available to individuals, especially those not engaged in criminal activity, whose state constitutional rights are violated by federal agents. Individuals whose state constitutional rights have been violated by federal agents could invoke the judicial process, claiming entitlement under Article II, Section 10, and seek compensation for injuries resulting from lawless federal behavior. *See, e.g., Bivens*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (holding that an individual may bring a private cause of action under the Fourth Amendment, even in the absence of statutory authority, and is entitled to recover money damages for any injuries he has suffered as a result of a federal agent's violation of the Fourth Amendment). Therefore, I believe that the majority's application of Article II, Section 10, to the actions of federal agents at federal border patrol checkpoints, implicates serious issues of supremacy and federalism. For these reasons, I respectfully disagree with the majority's conclusion that federal agents are subject to the New Mexico Constitution.

## II.

{32} In addition to questioning the majority's authority to hold that federal agents are subject to the provisions of our state constitution, this broad holding also undermines this Court's decision in *Gomez*, 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1. *Gomez* provided the analytical framework for a New Mexico court's departure from federal jurisprudence based on independent state constitutional interpretation, or "New Federalism." "New Federalism" is "the expression of state courts' increasing tendency to interpret their constitutions to provide individuals with greater rights than those guaranteed by the United States Constitution." James W.

federal government).

Diehm, *New Federalism and Constitutional Criminal Procedure: Are We Repeating the Mistakes of the Past?*, 55 Md. L.Rev. 223, 224 (1996). "New Federalism" was articulated by former Justice Brennan who urged states to depend on their own state constitutional guarantees rather than to rely automatically on the United States Supreme Court to interpret the scope of liberties that should be afforded to individuals within their state. *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489, 491 (1977). The former Justice emphasized:

> State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed.

*Id.; see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (concluding that each state has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution"). For several years prior to and after Justice Brennan's call to action, "the New Mexico Constitution was interpreted in 'lock-step' with federal precedent interpreting the United States Constitution when parallel provisions were involved." *Gomez*, 1997–NMSC–006, ¶16, 122 N.M. 777, 932 P.2d 1. Essentially, the New Mexico Constitution was not independently interpreted and our constitutional jurisprudence mirrored that of the federal constitution.[3]

{33} Then, in 1989, this Court in *State v. Cordova*, 109 N.M. 211, 217, 784 P.2d 30, 36 (1989), departed from federal constitutional precedent by retaining the "veracity" and "basis of knowledge" tests articulated in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), to govern the determination of probable cause for the issuance of a search warrant, instead of the later "totality of the circumstances" test adopted by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Even after *Cordova*, however, New Mexico courts lacked a consistent analytical framework to assist in determining when and how state courts should analyze issues under the federal Constitution and when such issues should be analyzed pursuant to the New Mexico Constitution.[4] Accordingly, the pur-

---

**3.** *See, e.g., State v. Deltenre*, 77 N.M. 497, 503–04, 424 P.2d 782, 786 (1966), *overruled on other grounds by State v. Martinez*, 94 N.M. 436, 439, 612 P.2d 228, 231 (1980) (declaring that although an arrest is valid under federal standards, the warrantless arrest must still be tested by New Mexico standards, but simply concluded with no analysis that "nothing in the New Mexico cases ... vitiates the validity of the arrest in this case"); *State v. Garcia*, 76 N.M. 171, 174, 413 P.2d 210, 212 (1966) (referring to Article II, Section 10 as "almost identical" with the Fourth Amendment); *State ex rel. Serna v. Hodges*, 89 N.M. 351, 356, 552 P.2d 787, 792 (1976), *overruled on other grounds by State v. Rondeau*, 89 N.M. 408, 412, 553 P.2d 688, 692 (1976) (recognizing that "as the ultimate arbiters of the law of New Mexico[,][w]e are not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution" but analyzing the New Mexico Constitution as providing the same protection as the federal Constitution); *State v. Sandoval*, 92 N.M. 476, 478, 590 P.2d 175, 177 (Ct.App.1979) (applying the federal "automobile exception" without consideration of the New Mexico Constitution); *State v. Pena*, 108 N.M. 760, 779 P.2d 538 (1989) (same), *overruled by Gomez*, 1997–NMSC–006, ¶35, 122 N.M. 777, 932 P.2d 1.

**4.** *See, e.g., State v. Gutierrez*, 116 N.M. 431, 447, 863 P.2d 1052, 1068 (1993) (rejecting the federal "good faith exception" to the exclusionary rule); *State v. Attaway*, 117 N.M. 141, 147, 151, 870 P.2d 103, 109, 113 (1994) (holding that the New Mexico Constitution embodies a knock-and-announce requirement while the United States Supreme Court had not addressed whether a knock-and-announce requirement was required for officers executing a search warrant); *Campos v. State*, 117 N.M. 155, 158, 870 P.2d 117, 120 (1994) (declining to adopt the blanket federal rule that "all warrantless arrests of felons based on probable cause are constitutionally permissible in public places"); *State v. Madalena*, 121 N.M. 63, 68–69, 908 P.2d 756, 761–62 (Ct.App. 1995) (recognizing its authority to depart from federal constitutional precedent in determining whether a sobriety checkpoint is reasonable but not fully analyzing a reason for the departure); *State v. Breit*, 1996–NMSC–067, ¶35, 122 N.M. 655, 930 P.2d 792 (narrowly expanding the federal double jeopardy standard).

pose of this Court's decision in *Gomez* was to resolve any conflict in our case law and to provide a concise analytical tool to decide such issues.

{34} *Gomez* provided a methodological approach to the resolution of parallel federal and state constitutional claims. In *Gomez*, this Court addressed whether a warrantless search of an automobile and closed containers found within was lawful absent exigent circumstances. 1997–NMSC–006, ¶ 46, 122 N.M. 777, 932 P.2d 1. Under the federal automobile exception, a warrantless search of an automobile only required probable cause with *no showing of exigent circumstances*. *See United States v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The defendant sought greater protection under Article II, Section 10 of the New Mexico Constitution, arguing that the warrantless search of his vehicle was invalid because there were no exigent circumstances to justify the police officer's failure to obtain a warrant. *See Gomez*, 1997–NMSC–006, ¶ 2, 122 N.M. 777, 932 P.2d 1. To resolve the issue, this Court evaluated the primacy and interstitial approach to independent constitutional interpretation. *See id.* ¶ ¶ 18–20. Under the primacy approach, " '[i]f a defendant's rights are protected under state law, the court need not examine the federal question. If a defendant's rights are not protected under state law, the court must review the matter in light of the federal constitution.' " *Id.* ¶ 18 (quoting Shirley S. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Tex. L.Rev. 1141, 1170 (1985)). "Courts using this approach do not consider federal law and analysis presumptively valid, viewing them instead as no more persuasive than decisions of sister state supreme courts." Robert F. Utter & Sanford E. Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique*, 20 Ind. L.Rev. 635, 647 (1987). This Court rejected the primacy approach because it did not adequately " 'preserve national uniformity in development and

application of fundamental rights guaranteed by our state and federal constitutions.' " *Gomez*, 1997–NMSC–006, ¶ 21, 122 N.M. 777, 932 P.2d 1 (quoting *State v. Gutierrez*, 116 N.M. 431, 436, 863 P.2d 1052, 1057 (1993)). The interstitial approach, on the other hand, effectively advances this goal and, therefore, this Court adopted that approach. *See id.*

{35} The interstitial approach "reflects the modern role of the U.S. Constitution as the basic protector of fundamental liberties, while allowing states the opportunity to supplement the minimum protections afforded by the U.S. Constitution." Jennifer Cutcliffe Juste, *Constitutional Law—The Effect of State Constitutional Interpretation on New Mexico's Civil and Criminal Procedure— State v. Gomez*, 28 N.M. L.Rev. 355, 359 (1998) (internal quotation marks and footnote omitted). Unlike the primacy approach, the interstitial approach considers federal precedent "highly persuasive and presumptively correct." *Id.* This presumption, however, is not irrefutable. New Mexico can depart from federal constitutional principles when required by compelling reasons. *See Gomez*, 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. Therefore, under the interstitial approach, the court first determines "whether the right being asserted is protected under the federal constitution." *Id.* If the federal Constitution protects the right being asserted, then the state constitutional claim is not reached. *See id.* The state constitution is examined only if the federal Constitution does not provide protection. *See id.* A state court "may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." [5] *Id.* In adopting this approach, this Court recognized that, " '[A] considerable measure of cooperation must exist in a truly effective federalist system.' " *Id.* ¶ 21 (quoting *State v. Hunt*, 91 N.J. 338, 450 A.2d 952, 964 (1982) (Handler, J., concurring)). Accordingly, " 'state courts should be sensitive to developments in federal law.' " *Id.*

---

**5.** In *State v. Hunt*, the New Jersey Supreme Court suggested additional reasons to justify the divergence from federal constitutional interpretation: (1) differences in textual language; (2) legislative history; (3) preexisting state law; (4) structural differences between state and federal constitutions; (5) matters of particular state interest or local concern; (6) state traditions; and (7) public attitudes. *91 N.J. 338, 450 A.2d 952, 965–67 (1982) (Handler, J., concurring).*

The interstitial approach, therefore, maintains a balance between state autonomy and federal cooperation.

{36} The majority's holding in this case that the New Mexico Constitution applies to actions of federal agents conflicts with the underlying constitutional policy of New Mexico pronounced in *Gomez*. By concluding that the New Mexico Constitution directly governs federal action, the majority does not advance national uniformity and respect for federal constitutional precedent. Instead, New Mexico constitutional law becomes the primary source of individual rights. Federal power is summarily dismissed, making the New Mexico Constitution supreme with little consideration of federal authority. *Gomez* was meant to provide some consistency to independent state constitutional interpretation while advancing the orderly development of state constitutional law. These goals, however, were meant to be achieved with some deference to federal law, not with contempt for federal constitutional concerns. The majority's *Gomez* analysis is perfunctory since it does not follow the spirit of cooperation upon which *Gomez* was decided. Moreover, the underlying policies and "New Federalism" issues triggered in *Gomez* are complex and have energized great discussion. Unfortunately, the majority's failure to address the Court of Appeals' misapplication of the interstitial approach in resolving this case provides little guidance to our lower courts and thereby contributes to *Gomez*'s misuse and misunderstanding. In the following section, I will analyze the instant case under *Gomez* and indicate where I disagree with the majority's reasoning and where I believe the Court of Appeals' erred in its analysis.

### III.

{37} To resolve this issue, the Court must preliminarily determine whether a *Gomez* analysis is appropriate in this case. A *Gomez* analysis is appropriate in a criminal case when a defendant contends that his or her rights were violated in contravention of the federal Constitution and the state constitution. 1997–NMSC–006, ¶¶ 22–23. In such cases, the party must assert in the trial court

that the state constitutional right should be interpreted more expansively than the federal counterpart and preserve the issue for appellate review. *See id.* ¶ 23. Here, I agree with the majority that the Defendant adequately raised and preserved for review the federal and state constitutional issues, thereby triggering a *Gomez* analysis. *See* Majority Opinion, ¶¶ 11–13.

### A.

{38} After determining that *Gomez* is applicable, the Court must then address whether the right being asserted by the Defendant is protected under the federal Constitution. 1997–NMSC–006, ¶ 33, 122 N.M. 777, 932 P.2d 1. Here, the Defendant argues that his Fourth Amendment right to be free from unlawful search and seizure was violated because: (1) the border patrol agent referred him to secondary inspection without adequate justification, thereby unlawfully prolonging his detention; (2) his consent to search his vehicle was not voluntary since it was a product of an unlawful detention; and (3) even assuming that his consent was voluntary, the dismantling of his vehicle exceeded the scope of his consent. This case turns on the Defendant's first argument—the referral to secondary inspection. In analyzing whether the Defendant is protected under the federal Constitution, the Court should follow precedent established by the federal courts. *See Snyder*, 1998–NMCA–166, ¶ 9, 126 N.M. 168, 967 P.2d 843.

{39} The critical federal case with respect to permanent border patrol checkpoints is *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In *Martinez–Fuerte*, motorists were slowed and visually screened as they passed through a permanent border checkpoint located within California's borders. *See id.* at 546, 96 S.Ct. 3074. In a small number of cases, the border patrol agent conducting the visual inspection would refer some cars to a secondary inspection area where their occupants would be asked about their citizenship and immigration status. *See id.* The Court recognized that "checkpoint stops are 'seizures' within the meaning of the Fourth Amendment." *Id.* at 556. Generally, a warrantless

search and seizure is per se unreasonable under the Fourth Amendment unless justified by an exception to the general rule. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Therefore, the Court considered "whether a vehicle may be stopped at a fixed checkpoint for brief questioning of its occupants even though there is no reason to believe the particular vehicle contains illegal aliens," thereby creating an exception to the warrant requirement. *Martinez–Fuerte*, 428 U.S. at 545, 96 S.Ct. 3074. Balancing the interests of the government with the minimal intrusion on the privacy of the motorists, the Court held that, "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by [a] warrant." *Id.* at 566. The Court further noted that, "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the *scope of the stop*." *Id.* at 566–67 (emphasis added). Thus, the Fourth Amendment is not automatically violated simply because a motorist is referred to a secondary inspection area to conduct a routine inquiry. *See id.* at 563, 96 S.Ct. 3074. In fact, the Court noted that "the Border Patrol officers must have wide discretion in selecting the motorist to be diverted for the brief questioning involved." *Id.* at 563–64, 96 S.Ct. 3074. Therefore, under federal law the relevant inquiry focuses on the *scope* and not the location of a permissible routine inquiry to determine the constitutionality of a detention at a fixed border checkpoint.

{40} The Court in *Martinez–Fuerte* did not define the outer most limits of the permissible scope of an agent's initial routine inquiry. In keeping with the spirit of *Martinez–Fuerte*, however, the Tenth Circuit has held that a permissible routine inquiry includes questions " 'concerning such things as vehicle ownership, cargo, destination, and travel plans ... if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband.' " *United States v. Chavira*, 9 F.3d 888, 889 (10th Cir.1993) (quoting *United States v. Rascon–Ortiz*, 994 F.2d 749, 752 (10th Cir. 1993)) (emphasis omitted). Additionally, "[t]he Fourth Amendment does not require police officers to close their eyes to suspicious circumstances." *United States v. Johnson*, 895 F.2d 693, 696 (10th Cir.1990) (citing *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). Therefore, suspicious circumstances may also justify a brief detention for further questioning. *See Chavira*, 9 F.3d at 889. "[I]f questioning reasonably related to immigration and customs matters and the agent's observations indicates suspicious circumstances, further questioning *as part* of the *routine permanent checkpoint inquiry* is permissible as long as the duration of the detention remains brief." [6] *United States v. Ludlow*, 992 F.2d 260, 264 (10th Cir.1993) (emphasis added). Moreover, when the federal agent is in the process of performing a routine inquiry, a referral to secondary inspection is legally immaterial. *See id.* at 263–64; *see also Martinez–Fuerte*, 428 U.S. at 562–63, 96 S.Ct. 3074. "[A] routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both *as long as the scope of the inquiry* is appropri-

---

**6.** I respectfully disagree with Chief Justice Serna's analysis of United States Supreme Court precedent that, in his view, limits an agent's routine inquiry to those suspicious circumstances directly related to immigration. *See* Special Concurrence, Serna, C.J., ¶ 70 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 455, 148 L.Ed.2d 333 (2000)) ("If an agent is permitted to extend a detention due solely to suspicious circumstances relating to narcotics, there would be no check on the agent's ability to extend the detention indefinitely based only on the 'generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.' "). To the contrary, the Court in *Edmond* only ad-

dressed the "constitutionality of a highway checkpoint program whose *primary purpose* [was] the discovery and interdiction of illegal narcotics." 121 S.Ct. at 450 (emphasis added). The Court "express[ed] no view on the question [of] whether police may expand the scope of a [constitutionally valid] checkpoint seizure in order to detect the presence of drugs in a stopped car." *Id.* at 457 n. 2. The Court specifically noted that their holding "does not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." *Id.* at 457.

ate." *Ludlow*, 992 F.2d at 263–64 (emphasis added) (footnote omitted). Accordingly, no individualized suspicion is necessary to refer a motorist to a secondary inspection area if the agent remains within the permissible scope of the routine inquiry. *See id.* at 263; *United States v. Sanders*, 937 F.2d 1495, 1499 (10th Cir.1991).

{41} Under federal law, therefore, the analysis does not focus on the referral to secondary inspection, but on the scope of the agent's inquiry. Here, the agent testified that he grew suspicious of the Defendant because, although the Defendant was a legal resident and purportedly coming from El Paso, he was driving a truck with Mexican license plates. Also, the Defendant was driving on an indirect route to Albuquerque to pick up an inoperable car by himself, at night, without a tow bar. These facts reasonably aroused the agent's suspicions which allowed him to broaden the scope of his initial inquiry under federal law. *See Chavira*, 9 F.3d at 889 (concluding that the agent's suspicions were reasonably aroused when the defendant stated that he was en route to Oklahoma to buy cars but was driving alone and did not appear to be carrying a tow bar). Accordingly, pursuant to the Fourth Amendment, the border patrol agent in this case acted lawfully in expanding the scope of the initial routine inquiry. It was of no significance that the agent chose to complete the inquiry at a secondary inspection area.[7]

### B.

{42} Despite this federal precedent, the Court of Appeals purportedly resolved this case pursuant to the Fourth Amendment alone, not reaching the state constitution. The court held that the "Defendant's removal from the primary area to the secondary area was an unlawful extension of his detention because the federal agent met neither Tenth Circuit nor New Mexico case law requirements of suspicious circumstances or reasonable suspicion respectively." *Cardenas–Alvarez*, 2000–NMCA–009, ¶ 21, 128 N.M. 570, 995 P.2d 492. The court's decision was apparently "not premised on the application of a stricter standard under our own state constitutional provisions" but instead was based on their "application of both federal and [New Mexico] case law under the Fourth Amendment of the United States." *Id.* ¶ 24. I disagree with this analysis. Although the Court of Appeals purported to interpret the Fourth Amendment, they did so by departing from United States Supreme Court precedent, as well as Tenth Circuit case law. *See id.* ¶ 32 (Sutin, J., dissenting). New Mexico courts do not have the authority to depart from United States Supreme Court precedent by providing greater protection under the Fourth Amendment. *See Arizona v. Evans*, 514 U.S. 1, 9, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (recognizing that the United States Supreme Court is the final arbiter of the federal Constitution). By pronouncing a rule that provides greater protection to individuals than the Fourth Amendment mandates, New Mexico courts are providing a different state standard. Such a state standard could only be affirmed pursuant to the authority given to New Mexico courts by the New Mexico Constitution. Therefore, the Court of Appeals applied a different state standard without performing a complete interstitial analysis under *Gomez*.[8] Having

---

7. The Defendant next argues that the consent to search his vehicle, which was obtained from him by border patrol agents after he was referred to secondary, was invalid because the dismantling of his vehicle exceeded the scope of his consent. I concur in the majority's analysis of the consent issue under the Fourth Amendment. I would only emphasize that *Gomez* requires courts to completely analyze all issues under the federal Constitution before commencing a state constitutional analysis. For instance, had the agents in this case exceeded the scope of the Defendant's consent, the federal Constitution would have provided the Defendant with protection and the state constitutional issues would not need to have been addressed. Since the agents' dismantling of the vehicle in this case was reasonably within the scope of the Defendant's consent, however, their actions were lawful under the federal Constitution. Therefore, finding that the federal Constitution does not provide the Defendant with protection, the state constitutional issue should be addressed.

8. By independently analyzing the state and federal standards, the Court of Appeals engaged in an analytical process more akin to a dual sovereignty approach to independent state constitutional interpretation, rather than an interstitial approach. Under the dual sovereignty approach, "both the state and the federal constitutions provide independent and equivalent sources of indi-

concluded that the federal Constitution does not provide the Defendant with protection and that the Court of Appeals impermissibly expanded the protections afforded to the Defendant under the Fourth Amendment, in the following section I will analyze this case under Article II, Section 10 of the New Mexico Constitution and highlight the fine distinction between federal and state case law.

## IV.

{43} First, for the Defendant to benefit from the protections of our constitution, there must be sufficient state action to trigger the New Mexico Constitution. This is the most problematic aspect of this case since the search and seizure challenged by the Defendant was performed by federal and not state agents. I do not agree with the majority that our state constitution is implicated only if it controls the actions of federal agents. I believe, as more fully detailed below, that the constitutionally significant fact is that the state prosecutor is attempting to use the evidence seized against the defendant in the prosecution for a violation of a state statute in a state court. The issue in this case is not whether the New Mexico Constitution applies to federal agents, but whether New Mexico's constitutional standards govern the admissibility of evidence resulting from a search by federal agents in New Mexico and turned over to state authorities for use in a criminal proceeding under New Mexico law in a New Mexico court. I believe that our state constitution governs the admissibility of such evidence in our state courts.

## A.

{44} Before analyzing the instant case under Article II, Section 10 of the New Mexico Constitution, there must be a threshold determination as to whether the protections of the New Mexico Constitution are implicated. In order to invoke the protections of our state constitution, there must be some "state action." *See State v. Johnston*, 108 N.M. 778, 780, 779 P.2d 556, 558 (Ct.App.1989) (holding that like the provisions of the Fourth Amendment, Article II, Section 10 does not apply to private persons). "State action ... refers to exertions of state power in all forms." *Shelley v. Kraemer*, 334 U.S. 1, 20, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). For instance, state action "includes action of state courts and state judicial officials." *Id.* at 18, 68 S.Ct. 836. In the present case, the state prosecutor used the evidence obtained by the federal border patrol agents to get a conviction in a New Mexico district court for a violation of a New Mexico law, NMSA 1978, § 30–31–22 (1990). As the Oregon Supreme Court pronounced in *Davis*, 834 P.2d at 1012–13, and as recognized in *Snyder*, 1998–NMCA–166, ¶ 11, 126 N.M. 168, 967 P.2d 843 the constitutionally significant fact is that the New Mexico government sought to use and did, in fact, use the evidence in a New Mexico prosecution. Although there was no state action at the time the search was conducted because state agents were not involved in the federal investigation, state action occurred when the State filed charges against the Defendant and sought to convict him with evidence seized by federal border patrol agents. Since the Defendant is being tried for a crime defined by New Mexico penal law, there is no reason why he should not also be afforded the benefit of our state's search and seizure provisions. *See People v. Griminger*, 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409, 412 (1988). Therefore, state action exists which triggers the New Mexico Constitution, when the State seeks to introduce evidence obtained by federal agents in a New Mexico state court.[9]

---

vidual rights." *Juste, supra*, at 360. This approach mandates an examination of both sources in every case and allows the states to begin their analysis with either source. *See id.* As a result, state constitutional law is always examined. This method is distinct from the interstitial method of *Gomez*, since the state constitutional issue is not examined if the right being asserted is protected under the federal constitution. 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1.

9. This rule does not affect the validity of the search with respect to the federal Constitution authorizing the search. To the contrary, this conclusion only confirms that state law determines the admissibility of evidence in state court. *See State v. Rodriguez*, 317 Or. 27, 854 P.2d 399, 416 n. 13 (1993) (Unis, J., specially concurring). I recognize that there are some jurisdictions that hold that state constitutional protections do not determine the admissibility of evidence which

{45} State constitutional principles do not apply, however, when the State seeks to use evidence obtained by private citizens. A federal border patrol agent, who exercises jurisdiction over the citizens of New Mexico, is fundamentally unlike a private actor because they act under a "cloak of authority." Unlike private actors, federal agents have the authority to implement permanent border patrol checkpoints and order individuals to stop, answer questions, and produce documentation. *See generally Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116. Federal agents also have the power to arrest. When individuals are forced to stop and be questioned by governmental authority, the invasion to their right to privacy and freedom of movement is compromised, regardless of which governmental entity is actually exerting its power—state or federal. Therefore, there is a fundamental difference between federal border patrol agents and private persons. As such, evidence obtained from government agents should be treated differently than evidence obtained from private actors. Because the evidence in this case was obtained by federal agents, the New Mexico Constitution determines the admissibility of the evidence in state court.

### B.

{46} Having established that the New Mexico Constitution is triggered in this case because the State seeks to use evidence obtained by federal agents, the Court must next determine whether the state constitution provides protection to the Defendant. *See Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. If the Court determines that the state constitution should provide greater protection to the Defendant, the Court must justify such a departure from federal constitutional precedent. *See id.*

{47} It is evident from cases pertaining to the issue of border patrol checkpoints, in both New Mexico and federal courts, that the present case is not easily resolved. It is difficult to determine what, if any, distinction there is between New Mexico and federal case law. New Mexico and federal cases are quite similar in resolving the extent of a permissible detention at a fixed border checkpoint within our state's boundaries. For instance, like New Mexico, federal law requires that "[f]urther detention of an individual *beyond the scope of a routine checkpoint stop* must be based upon reasonable suspicion, consent, or probable cause." *United States v. Massie,* 65 F.3d 843, 848 (10th Cir.1995) (emphasis added); *see also State v. Estrada,* 111 N.M. 798, 799, 810 P.2d 817, 818 (Ct.App.1991) ("At motor vehicle checkpoints, travelers are constitutionally subject only to brief questioning and limited visual inspection of their vehicles. More extensive detention must be based on some degree of individualized suspicion or consent."). Additionally, New Mexico cases have agreed that the permissible scope of an initial routine inquiry includes "questions regarding citizenship of the vehicle's occupants or a *suspicion of criminal activity.*" *Estrada,* 111 N.M. at 799, 810 P.2d at 818 (emphasis added). New Mexico cases even purport to distinguish between diversion to secondary for the purpose of completing the routine inquiry and diversion to secondary after the routine questioning and investigation has been completed. *See id.* (distinguishing federal cases that required less than reasonable suspicion because "[r]eferral to a secondary area [in those cases occurred] only after suspicions were raised by circumstances revealed during the initial questioning").

{48} Despite the fact that New Mexico cases appear to agree with federal cases,

---

was obtained by federal officers in conformity with federal law. *See, e.g., State v. Mollica,* 114 N.J. 329, 554 A.2d 1315, 1330 (1989) ("[New Jersey's] state constitutional protections against unreasonable searches and seizures do not govern the legality of the actions of federal officers with respect to their search and seizure of evidence, provided that their conduct is pursuant to federal authority and consistent with applicable federal law[.]"). Unlike New Mexico's exclusionary rule which focuses on the constitutional right

of the accused to be free from unreasonable searches and seizures, *see Gutierrez,* 116 N.M. at 446, 863 P.2d at 1067, the essential objective of the exclusionary rule in these jurisdictions is to deter unlawful police conduct. *See Mollica,* 554 A.2d at 1328 ("[W]e recognize that an essential objective of our constitutional protection against unreasonable search and seizure and the remedial exclusionary rule is to deter unlawful police conduct."). As such, I find the cases in these jurisdictions unpersuasive.

New Mexico courts place legal significance on an agent's referral of a motorist to secondary inspection.[10] For example, in *Estrada*, the defendant and his passenger were stopped at the primary area of a fixed border checkpoint and questioned about their citizenship. *Id.* at 798, 810 P.2d at 817. They both produced immigration documents. *See id.* Although they did not display any unusual behavior, the border patrol agent noticed that the spare tire in the rear of the station wagon was out of place and, based on this, referred the defendant to a secondary area. *See id.* The court found that the diversion to secondary was not proper stating, "Although the agent's observation regarding the spare tire could justify further questioning, it could not justify the additional detention here." *Id.* at 802, 810 P.2d at 821; *see also State v. Guzman*, 118 N.M. 113, 117, 879 P.2d 114, 118 (Ct.App.1994). Under *Estrada*, therefore, had the officers merely questioned the defendant about the spare tire at primary inspection, the detention would be constitutional. However, upon referral to secondary the routine inquiry was complete and further detention required reasonable suspicion. *See Estrada*, 111 N.M. at 800–01, 810 P.2d at 819–20 ("Once the routine questioning and inspection were completed, further detention had to be based on at least reasonable suspicion of criminal activity."). By presumptively terminating the initial inquiry, New Mexico courts consider the mere referral to secondary as legally significant. *See, e.g., Cardenas–Alvarez*, 2000–NMCA–009, ¶ 10, 128 N.M. 570, 995 P.2d 492 (citing *State v. Affsprung*, 115 N.M. 546, 550, 854 P.2d 873, 877 (Ct.App.1993)) ("[M]ovement to a secondary area is considered detention beyond a reasonable inquiry.").[11]

{49} Therefore, in the context of a border patrol checkpoint seizure, unlike federal law, New Mexico law considers a referral to secondary as presumptively terminating the initial routine inquiry, thereby requiring that an officer have reasonable suspicion before ordering an individual from primary to secondary inspection. *See Estrada*, 111 N.M. at 802, 810 P.2d at 821; *Guzman*, 118 N.M. at 117, 879 P.2d at 118. I agree that in the present case, the facts identified by the agent to be "suspicious" did not rise to the level of reasonable suspicion under Article II, Section 10 of the New Mexico Constitution. Accordingly, had a state agent referred the Defendant to secondary under the same circumstances, the prolonged detention would be unlawful. In this case, however, it is not enough to simply conclude that the state constitution would provide greater protection to the Defendant than the federal Constitution. *See Gomez*, 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. Since both *Estrada* and *Guzman* were decided prior to *Gomez*, we should conduct a complete *Gomez* analysis to ensure that these pre-*Gomez* cases had a sufficient justification for the departure

10. I do not agree with the majority that "the New Mexico Constitution demands that after a Border Patrol agent has asked about a motorist's citizenship and immigration status, and has reviewed the motorist's documents, any further detention requires reasonable suspicion of criminal activity." Majority Opinion, ¶ 20. First, this interpretation of the New Mexico Constitution is unsupported by New Mexico case law. *See State v. Affsprung*, 115 N.M. 546, 549, 854 P.2d 873, 876 (Ct.App.1993) (recognizing that a border patrol agent, within the scope of a permissible checkpoint inquiry, may ask questions of the driver and passenger about citizenship and ask them to explain suspicious circumstances); *State v. Guzman*, 118 N.M. 113, 115, 879 P.2d 114, 116 (Ct.App.1994) (concluding that the agent's questions about where the defendant was coming from and whether the defendant was the owner of the vehicle were constitutionally permissible even though the agent was satisfied that the defendant was lawfully in the country); *State v.*

*Porras–Fuerte*, 119 N.M. 180, 185, 889 P.2d 215, 218 (Ct.App.1994) (concluding that agents could permissibly ask the defendant about suspicious circumstances so as to develop reasonable suspicion). Moreover, the majority's conclusion that New Mexico law only permits a federal agent to ask limited preliminary questions pertaining to the citizenship and immigration, coupled with its holding that federal agents are subject to the provisions of the New Mexico Constitution, further infringes on the supremacy of federal law. This interpretation so severely frustrates border patrol agents' statutory duty to stop the smuggling of illegal aliens and contraband that federal agents will never be able to conform to the mandates of the New Mexico Constitution and execute their obligations under federal law.

11. The Court of Appeals failed to recognize the significance of this distinction between New Mexico and federal case law.

from federal precedent.[12] Unfortunately, the majority forgoes this essential step in the *Gomez* analysis by simply concluding that prior New Mexico cases analyze border patrol checkpoint seizures differently than federal case law. *See* Majority Opinion, ¶ 16. Under *Gomez*, however, a distinct approach in New Mexico case law does not justify a departure from federal constitutional precedent. A complete *Gomez* analysis requires that this Court must justify a departure from federal precedent by determining that either: (1) the federal analysis is flawed; (2) there exist structural differences between the state and federal government; or, (3) there exist *distinctive state characteristics*. 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (emphasis added).

{50} Due to the complexity of *Gomez*, it is helpful to first illustrate situations which justify departure under these criteria. The first criteria justifying departure from federal precedent is illustrated in *Gomez*. *Gomez* provides an example for departing from federal precedent due to a flawed federal analysis. *Id.* ¶ 44. In *Gomez*, this Court concluded that the reasoning underlying the automobile exception, which only requires probable cause to search a vehicle, is impractical because if "there is no *reasonable* basis for believing an automobile will be moved or its search will otherwise be compromised by delay," then there is no reason for not obtaining a warrant. *Id.* (emphasis in original.). The New Mexico Constitution, therefore, justifiably provides greater protection to individuals in their vehicles by mandating that an officer obtain a warrant to search an automobile unless there are probable cause and exigent circumstances to justify the warrantless search. *See id.* ¶ 46. Moreover, as a second justification for departure, we recognized that the United States Supreme Court's blanket adoption of a bright-line rule, such as the automobile

exception, caused tension in the Supreme Court's pronouncements which disavowed bright-line rules in favor of " 'emphasizing the fact-specific nature of the reasonableness inquiry.' " *Id.* ¶ 45 (quoting *Ohio v. Robinette*, 519 U.S. 33, 34, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). The United States Supreme Court has realized the importance of recognizing the "endless variations in the facts and circumstances implicating the Fourth Amendment." *Id.* (quoting *Robinette*, 519 U.S. at 39) (internal quotation marks omitted). Contrary to this recognition, the Supreme Court adopted the automobile exception, a bright-line rule which does not allow consideration of such factual variations. *See id.* As such, this Court in *Gomez* found that the analysis underlying the federal automobile exception was flawed and chose to depart from such precedent.

{51} The second criterion, "structural differences between the state and federal government," justifies a departure from federal precedent when there are specific textual differences between the state constitution and the federal Constitution. *See State v. Woodruff*, 1997–NMSC–061, ¶ 25, 124 N.M. 388, 951 P.2d 605. In *Woodruff*, this Court held that Article II, Section 14 of the New Mexico Constitution contained no structural differences compelling departure from the United States Constitution. *Id.* In reaching this conclusion this Court compared Article II, Section 14 of the New Mexico Constitution with Article I, Section 14 of the Hawaii Constitution. *See id.* The Hawaii Constitution states, "The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment." *Compare* H.I. Const. art. I, § 14 *with* U.S. Const., amend VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."). Unlike the New Mexico Constitution, Hawaii's constitutional provision pro-

---

**12.** I emphasize that cases decided after *Gomez* that involve instances where it has been resolved that the state constitution provides greater protection, need not again undergo a full *Gomez* analysis. For instance, in *State v. Warsaw*, 1998–NMCA–044, ¶¶ 18–19, 125 N.M. 8, 956 P.2d 139, the Court of Appeals held, without conducting a complete *Gomez* analysis, that Article II, Section 10 of the New Mexico Constitution requires both probable cause and exigent circumstances to justify the warrantless search of an automobile. The Court of Appeals did not need to analyze the validity of its departure from federal precedent since this Court in *Gomez* already fully analyzed the issue and articulated a sufficient justification for departure from the federal automobile exception.

tecting the right to counsel is textually different from the Sixth Amendment. *See id.* Whereas the structural differences between Hawaii and the federal government in the context of the right to counsel justified a departure, no such differences exist between the New Mexico Constitution and the United States Constitution that would justify a departure from federal Sixth Amendment precedent. *See id.*

{52} In the instant case, there is no flaw in the federal analysis, nor are there structural differences that warrant departure from federal precedent in the context of permanent border patrol checkpoint seizures.[13] The last criteria identified in *Gomez*, however, does justify departure from federal precedent in this context. The existence of "distinctive state characteristics," justify a departure where a certain constitutional right has a "unique importance in our state." *Woodruff*, 1997–NMSC–061, ¶ 25, 124 N.M. 388, 951 P.2d 605. New Mexico is one of a few states that are close to or border on an external border of the United States. The federal government, pursuant to statutory authorizations, has the power to implement permanent border patrol checkpoints so that they may interrogate those believed to be aliens as to their right to be in the United States. *See* 8 U.S.C. § 1357(a)(1), (a)(3) (2000) ("Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant— (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" ... "within a reasonable distance from any external boundary of the United States...."). The authority conferred by federal statutes may be exercised anywhere within 100 air miles of the border. *See* 8 C.F.R. § 287.1(a)(2) (2001). Consequently, in addition to aliens who have recently crossed the Mexican border, individuals who reside or travel within 100 air miles of the border within the State of New Mexico, are also subject to such federal interrogation.

{53} In the present case, the permanent border patrol checkpoint was sixty miles within the interior of New Mexico. Accordingly, it is quite possible that a significant percentage of domestic traffic continuously passes through the checkpoint everyday. The presence of domestic traffic through a border patrol checkpoint is a significant factor to consider when analyzing the limits of border patrol search and seizure law. *See, e.g., Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ("[T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search...."); *United States v. Jackson*, 825 F.2d 853, 858 (5th Cir.1987) ("It is the *single fact* that the individual or item has entered this nation from outside that justifies the [border] search.") (emphasis in original). Since not all individuals that are required to stop at a permanent checkpoint have been outside the United States but are New Mexico motorists lawfully traveling on New Mexico's highways, New Mexico has an interest in providing some protection to individuals who are compelled to pass through a checkpoint. Under federal law, a border patrol officer has wide discretion in continuing to detain an individual at a checkpoint. *See Ludlow*, 992 F.2d at 263–64 (quoting *United States v. Pinedo–Montoya*, 966 F.2d 591, 593 (10th Cir.1992) ("Border patrol agents have virtually unlimited discretion to refer cars to the secondary inspection area.") (internal quota-

13. It is important to emphasize that when determining whether there exists a distinctive characteristic to justify departure, the analysis must continue to focus on the specific constitutional principle-permanent border patrol checkpoint seizures-which was analyzed under federal law, rather than New Mexico constitutional law as a whole. Departure is not warranted simply because New Mexico's exclusionary rule is based on a rationale distinct from the federal exclusionary rule. *See Snyder*, 1998–NMCA–166, ¶ 15, 126 N.M. 168, 967 P.2d 843 (concluding that, unlike the federal exclusionary rule, "New Mexi- co's exclusionary rule is not based on the rationale that suppression of tainted evidence is warranted only if such suppression is likely to alter the behavior or polices of law enforcement officials"). If the difference in our exclusionary rule was the basis for departure, state constitutional interpretation would always prevail over federal law. Such a procedure would undermine the purpose of *Gomez*. Therefore, it is important to narrow the analysis and focus on the specific constitutional principle upon which the Defendant asserts protection.

tion marks and citation omitted.)). The referral to a secondary inspection area, however, undoubtedly is a further more significant intrusion since it not only extends the time of the detention, but also requires a motorist to abandon his or her route of travel and continue to a more isolated area for continued interrogation. To protect individuals who are merely traveling within the State, there must be some objective standard that ends a potentially limitless inquiry that forces the movement of a motorist to a secondary area. Without such a standard, a detention at a border checkpoint can be prolonged indefinitely. New Mexico, therefore, has a unique interest in regulating prolonged seizures and subsequent searches performed at permanent checkpoints located within its territory. Such distinctive characteristics justify a departure from federal precedent. Therefore, I agree with the departure from federal precedent articulated in *Estrada*, 111 N.M. at 802, 810 P.2d at 821, and *Guzman*, 118 N.M. at 117, 879 P.2d at 118, which presumptively terminates the initial inquiry and requires that a government agent have reasonable suspicion before a motorist can be referred to a secondary inspection area.

{54} This departure from federal precedent is limited to the context of prolonged seizures at permanent border patrol checkpoints within the interior of New Mexico. Permanent border patrol checkpoints are different from the international border where all individuals passing through have been out of the United States. *See, e.g., United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior."). Recognizing a distinction between the international border and permanent border patrol checkpoints does not weaken the importance of allowing federal agents to stop drivers at a permanent checkpoint without articulable suspicion or probable cause. "[M]aintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border." *Martinez–Fuerte*, 428 U.S. at 556, 96 S.Ct. 3074. Under New Mexico case law, individuals can be stopped at a border patrol checkpoint without justification. *See Estrada*, 111 N.M. at 799, 810 P.2d at 818. New Mexico's unique interest which justifies departure from federal precedent is confined only to prolonged detentions once an individual is stopped at an interior permanent border patrol checkpoint.

## V.

{55} Since the evidence obtained as a result of the prolonged seizure of the Defendant and subsequent search of his vehicle would be unlawful under Article II, Section 10 of the New Mexico Constitution had state officials conducted the search, our exclusionary rule prohibits the use of such evidence in a New Mexico state court. *See Snyder*, 1998–NMCA–166, ¶ 1, 126 N.M. 168, 967 P.2d 843. To effectuate the constitutional right of the accused to be free from unreasonable search and seizure, New Mexico courts must deny the State the use of evidence in a criminal proceeding in state court when that evidence results from an unreasonable search or seizure. *Id.* ¶ 16. By determining that individuals must have greater protection at border patrol checkpoints, we have determined that the referral to secondary inspection without reasonable suspicion is unreasonable. *See Estrada*, 111 N.M. at 802, 810 P.2d at 821; *Guzman*, 118 N.M. at 117, 879 P.2d at 118. The evidence in this case, therefore, should be suppressed.

## VI.

{56} In summary, although I concur in the result reached by the majority, I do not believe the majority fully analyzed all of the issues raised by this case. For this reason, I felt compelled to write separately to explain my concerns.

SERNA, Chief Justice (concurring in result).

{57} I concur in the result. However, I would affirm the Court of Appeals on the basis of the Fourth Amendment to the United States Constitution, and I respectfully believe it is unnecessary to reach the state constitutional question in this appeal. Under the interstitial approach outlined in *Gomez*,

we look first to federal law and only address the New Mexico Constitution if the right being asserted is not protected by the federal Constitution. This approach advances the "responsibility of state courts to preserve national uniformity in development and application of fundamental rights guaranteed by our state and federal constitutions." *Gomez,* 1997–NMSC–006, ¶ 21, 122 N.M. 777, 932 P.2d 1 (quoted authority and quotation marks omitted).

{58} The majority relies upon Tenth Circuit case law to conclude that the seizure in this case did not violate federal law. I do not disagree with the majority's interpretation of existing Tenth Circuit precedent. Instead, I disagree with the Tenth Circuit's construction of the opinions of the United States Supreme Court, and I also believe that a recent United States Supreme Court opinion raises some doubts about the Tenth Circuit's position on this issue. To begin with, the courts of New Mexico are bound by the United States Supreme Court's interpretation of the federal Constitution, but where the issue has not been explicitly resolved by the Supreme Court, we are not bound in our search for the meaning of the Fourth Amendment by the Tenth Circuit's interpretation of Supreme Court precedent. *See AS-ARCO, Inc. v. Kadish,* 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) ("[S]tate courts ... possess the authority, absent a provision for exclusive federal jurisdiction, to render binding decisions that rest on their own interpretations of federal law."); *see also Arizonans for Official English v. Arizona,* 520 U.S. 43, 58 n. 11, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Lockhart v. Fretwell,* 506 U.S. 364, 375–76, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) ("In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located. An Arkansas trial court is bound by this Court's (and by the Arkansas Supreme Court's and Arkansas Court of Appeals') interpretation of federal law, but if it follows the Eighth Circuit's interpretation of federal law, it does so only because it chooses to and not because it must." (citations omitted)). Tenth Circuit case law on the subject is merely persuasive, albeit substantially persuasive, authority. In this case, the Court of Appeals relied on New Mexico precedent in its interpretation of the Fourth Amendment, and I believe that this precedent correctly interprets federal law. *See Cardenas–Alvarez,* 2000–NMCA–009, ¶ 9, 128 N.M. 570, 995 P.2d 492 (citing to *State v. Affsprung,* 115 N.M. 546, 547, 854 P.2d 873, 874 (Ct.App. 1993), and *State v. Porras–Fuerte,* 119 N.M. 180, 184, 889 P.2d 215, 219 (Ct.App.1994), both of which interpreted federal law and neither of which cited Article II, Section 10). Under this precedent, the Fourth Amendment required individualized suspicion for Agent Arredondo to order Defendant to the secondary area.

{59} The starting point in the analysis under the Fourth Amendment is the United States Supreme Court's opinion in *Martinez–Fuerte,* in which the Court addressed the constitutionality of fixed checkpoints located a reasonable distance from the border at which individuals were stopped without particularized suspicion for the purpose of detecting illegal aliens. The Court determined that a stop at a border checkpoint constitutes a seizure within the meaning of the Fourth Amendment. *Martinez–Fuerte,* 428 U.S. at 556, 96 S.Ct. 3074. However, "weigh[ing] the public interest against the Fourth Amendment interest of the individual," *id.* at 555, 96 S.Ct. 3074, the Court concluded that there was a substantial public interest in maintaining a traffic-checking program to detect illegal immigration and that the intrusion on Fourth Amendments rights was "quite limited." *Id.* at 556–57, 96 S.Ct. 3074. As a result, the Court determined that the checkpoints did not violate the Fourth Amendment.

{60} Of particular relevance to the present case, the Court further determined that "it is constitutional to refer motorists selectively to the secondary inspection area ... on the basis of criteria that would not sustain a roving-patrol stop." *Id.* at 563, 96 S.Ct. 3074. However, the design of the checkpoint in *Martinez–Fuerte* differed from the checkpoint in the present case. In *Martinez–Fuerte,* all vehicles passed through a primary area only for general visual inspection in

order to minimize the intrusion on the general public, and most vehicles were allowed to continue through the checkpoint without further investigation. *Id.* at 546, 96 S.Ct. 3074. An agent at the primary area selected a small number of vehicles for further investigation at a secondary area, which included a closer visual inspection and brief inquiry into the occupants' citizenship and immigration status and which lasted an average of three to five minutes. *Id.* Thus, the secondary area in *Martinez–Fuerte* is equivalent to the primary area in the present case. In determining that referral to a secondary area was permissible, the Court in *Martinez–Fuerte* based its decision on the "sufficiently minimal" intrusion that occurred at the secondary area, *id.* at 563, 96 S.Ct. 3074, and indicated that any detention beyond the stops at issue in the case would require individualized suspicion or consent. *See id.* at 567, 96 S.Ct. 3074.

{61} The Court of Appeals first meaningfully examined *Martinez–Fuerte* in *State v. Estrada*, 111 N.M. 798, 810 P.2d 817 (Ct.App. 1991). In that case, the Court of Appeals explained that "[a]t motor vehicle checkpoints, travelers are constitutionally subject only to brief questioning and limited visual inspection of their vehicles. More extensive detention must be based on some degree of individualized suspicion or consent." *Id.* at 799, 810 P.2d at 818 (citation omitted). In response to an argument by the State that *Martinez–Fuerte* allows referral to secondary areas without reasonable suspicion, the Court of Appeals pointed out that

the questioning at the secondary area in [*Martinez–Fuerte*] was equivalent to the brief questioning performed at the primary area in this case. The issue in this case and in [*Martinez–Fuerte*], therefore, is not simply whether a secondary or primary area was the location of the questioning. The issue is the extent of detention allowed to accomplish the purposes of the checkpoint.

*Id.* at 800, 810 P.2d at 819 (citation omitted). The Court of Appeals noted that some federal courts had interpreted *Martinez–Fuerte* in accordance with the State's position, but the Court rejected this position as being inconsistent with the Supreme Court's analysis in *Martinez–Fuerte. Id.* ("We should distinguish between diversion to secondary for [the purpose of initial brief questioning and inspection] and diversion to secondary after the routine questioning and investigation has been completed."). The Court of Appeals reiterated this standard in *Affsprung:* "We have previously indicated that, in order to justify detention of a vehicle, *beyond routine questioning,* law enforcement agents need only have a reasonable suspicion of criminal activity." 115 N.M. at 549, 854 P.2d at 876 (emphasis added).

{62} Under New Mexico precedent interpreting the federal Constitution, then, it is not the referral to a secondary area in and of itself that triggers the need for reasonable suspicion;[1] it is the length of detention and the scope of the inquiry. "[I]f the issues of residence or citizenship are resolved at the primary area of the checkpoint, referral of a vehicle to the secondary area must be based on at least reasonable suspicion of wrongdoing." *Estrada,* 111 N.M. at 799, 810 P.2d at 818. In this case, Agent Arredondo resolved the issues of residence and citizenship at the primary area, and at the time of the referral to secondary, he lacked reasonable suspicion of criminal activity. Therefore, under *Estrada,* the seizure in this case violated the

---

1. The Court of Appeals concluded that "movement to a secondary area is considered detention beyond a reasonable inquiry." *Cardenas–Alvarez,* 2000–NMCA–009, ¶ 10, 128 N.M. 570, 995 P.2d 492. This conclusion misstates the holding of *Estrada* and *Affsprung* and, in any event, is in direct conflict with *Martinez–Fuerte.* As a result, this is not a proper characterization of federal law. Further, I would also reject the proposition that referral to a secondary area automatically requires reasonable suspicion under Article II, Section 10 of the New Mexico Constitution. The length of detention is always a benchmark in determining the reasonableness of a seizure and the level of justification that is required of the government. To focus only on the location of questioning at a checkpoint, rather than the content and length of questioning, would establish the type of "bright-line rule" that we have previously eschewed in our interpretation of Article II, Section 10. *See Gomez,* 1997–NMSC–006, ¶¶ 44–45, 122 N.M. 777, 932 P.2d 1. A determination of reasonableness must be made on a case-by-case basis in light of the totality of circumstances.

Fourth Amendment. By concluding that the federal Constitution offers no protection to Defendant in this case, the majority is effectively overruling *Estrada* and its progeny. I believe that this overruling of Court of Appeals' precedent is unwarranted because, as explained further below, *Estrada* represents a reasonable interpretation of *Martinez–Fuerte*.

{63} Additionally, I do not believe that the interpretation of *Martinez–Fuerte* by the Court of Appeals in *Estrada* is necessarily inconsistent with Tenth Circuit case law. Like *Estrada*, the Tenth Circuit does not focus on the location of the questioning, whether it takes place at a primary or secondary area; the focus is on the length of detention and the scope of inquiry. Perhaps unlike *Estrada*, the Tenth Circuit permits a limited inquiry into suspicious circumstances beyond questions concerning immigration during the initial brief investigation authorized by *Martinez–Fuerte*. However, the Tenth Circuit has also held that "when the questions asked at the primary inspection area satisfy all concerns about a person's citizenship and immigration status," an agent must have reasonable suspicion that a crime has been committed in order to direct a vehicle to a secondary area for further questioning. *United States v. Preciado*, 966 F.2d 596, 598 (10th Cir.1992). "When an officer seeks to expand the investigation of a motorist beyond the reasons stated for the checkpoint, he or she must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Galindo–Gonzales*, 142 F.3d 1217, 1221 (10th Cir.1998) (quotation marks and quoted authority omitted).

> Requiring an individualized, reasonable suspicion as a prerequisite to expanding the scope of detentions at fixed checkpoints protects motorists and passengers from random stops involving the "kind of standardless and unconstrained discretion [that] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent."

*Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)) (alteration in original). Thus, what is clear under Tenth Circuit precedent is that federal border agents must have reasonable suspicion in order to justify extending a detention at a fixed checkpoint once the purposes of the checkpoint have been satisfied. What is not clear under Tenth Circuit case law is whether the detection of narcotics is one of the purposes of a fixed border checkpoint located a reasonable distance inside the border.

{64} In *Sanders*, 937 F.2d at 1499–1501, the Tenth Circuit held that border patrol officers may ask questions about "suspicious circumstances," including circumstances related to narcotics trafficking, as part of the routine questioning under *Martinez–Fuerte*. The Tenth Circuit permitted border patrol agents to direct an individual to a secondary area after the individual responded to questions about citizenship and his destination because the individual was evasive in responding to a question about the contents of containers in his vehicle. *Id.* at 1499. The Tenth Circuit explained that "routine questions" at a border checkpoint can include asking about the ownership of the vehicle, asking to see the vehicle registration, and asking about the ownership and contents of cargo or containers, as well as follow-up questions if the initial inquiry produces suspicious circumstances. *Id.* at 1500–01. In *Chavira*, 9 F.3d at 889, the Tenth Circuit reaffirmed its position that, even in the absence of reasonable suspicion, border patrol agents may ask a few brief questions about such matters as an individual's destination and travel plans if the questions are reasonably related to illegal immigration and the smuggling of contraband. Further questioning and a brief detention is permitted if suspicious circumstances relating to immigration or contraband smuggling, falling short of reasonable suspicion, arise during the course of the routine questioning. *Id.* Based on these cases, it appears that the Tenth Circuit views an interior border patrol checkpoint as having the dual purpose of detecting illegal immigration and the smuggling of contraband. *See United States v. Ludlow*, 992 F.2d 260, 264 (10th Cir.1993).

{65} New Mexico cases thus differ from the Tenth Circuit in the interpretation of *Martinez–Fuerte* with respect to the permissible purposes for a fixed border checkpoint located inside the United States. I believe that New Mexico cases reflect a construction of the Fourth Amendment that more accurately accords with Supreme Court precedent. I also believe that the Tenth Circuit's position is now in some doubt. In a recent opinion, the Supreme Court addressed the constitutionality of a fixed checkpoint designed primarily to discover the possession of illegal drugs. *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 450, 148 L.Ed.2d 333 (2000). The Court discussed in some detail its opinion in *Martinez–Fuerte*. The Court noted that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Id.* at 451. The Court has "recognized only limited circumstances in which the usual rule does not apply." *Id.* Those limited circumstances have all involved programs "designed to serve special needs, beyond the normal need for law enforcement." *Id.* (quotation marks and quoted authority omitted). With respect to *Martinez–Fuerte*, the Court emphasized the " 'formidable law enforcement problems' posed by the northbound tide of illegal entrants into the United States" and "the difficulty of effectively containing illegal immigration at the border itself." *Id.* at 452 (quoting *Martinez–Fuerte*, 428 U.S. at 552, 96 S.Ct. 3074). The Court then contrasted these "special needs" from the general interest in crime control served by a drug checkpoint. *Id.* at 454–55. The Court noted the social evils and the "daunting and complex" law enforcement problems created by the drug trade. *Id.* at 454. However, the Court determined that "there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose" unless the Court drew the line at the general governmental interest of crime control. The Court therefore held that the drug checkpoint violated the Fourth Amendment. *Id.* at 458. "We cannot sanction stops [unsupported by reasonable suspicion] justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.* at 455.

{66} Although the Supreme Court stopped short of addressing whether a fixed border checkpoint established to detect illegal immigration may be enlarged to detect the possession of narcotics without individualized suspicion, *see id.* at 457 n. 2 (expressing "no view on the question whether police may expand the scope of a license or sobriety checkpoint seizure in order to detect the presence of drugs in a stopped car"); *see also United States v. Barnett*, 935 F.2d 178, 181 (9th Cir.1991) ("*Martinez–Fuerte* says nothing about the legality of searching for drugs at permanent immigration checkpoints."), I believe that the language used in both *Martinez–Fuerte* and *Edmond* supports the Court of Appeals' interpretation of the Fourth Amendment in *Estrada*. Under *Martinez–Fuerte*, the government's interest in conducting a seizure without reasonable suspicion is the substantial federal interest of "policing the Nation's borders," and a fixed checkpoint "serve[s] a border control function." *Edmond*, 121 S.Ct. at 452 ("Our subsequent cases have confirmed that considerations specifically related to the need to police the border were a significant factor in our *Martinez–Fuerte* decision."). Like the detection of illegal immigration, there is a substantial federal interest in preventing the smuggling of contraband across the international border. Thus, at the border, it would seem that a fixed checkpoint may be established for the dual purpose of detecting illegal immigration and preventing the smuggling of contraband.

{67} In *Martinez–Fuerte*, the Court explained that fixed checkpoints located away from the border at a reasonable distance inside the United States are necessary for the detection of illegal immigration because adequate detection at the border is a virtual law enforcement impossibility. 428 U.S. at 552, 556–57, 96 S.Ct. 3074. Unlike illegal immigration, however, it would be practically futile to detect whether narcotics possessed by an individual at an interior checkpoint had been transported across the border. Indeed, the illegal act sought to be uncovered by the border patrol at an interior checkpoint is not

the importation of the narcotics but their mere possession. Whereas illegal immigration is exclusively a border issue, possession of narcotics is a vice that can be committed wholly inside New Mexico without the necessity of crossing the international border. As a result, the interdiction of narcotics inside the United States does not directly implicate "the [federal] Government's interests in policing the Nation's borders." *Edmond*, 121 S.Ct. at 452. The detention of New Mexico residents on a New Mexico highway for the detection of illegal narcotics would again raise the specter of subjecting " 'the residents of … [border] areas to potentially unlimited interference with their use of the highways' " that attended the unconstitutional activity of random roving-patrol stops. *Martinez–Fuerte*, 428 U.S. at 558–59, 96 S.Ct. 3074 (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 882–83, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975))(omission and alteration in original). Additionally, in *Martinez–Fuerte*, the Supreme Court emphasized that the record in that case supported the need to establish interior checkpoints in order to detect illegal immigration. 428 U.S. at 554, 562, 96 S.Ct. 3074. There is no showing in the record in this case, however, that an interior checkpoint is necessary to prevent the importation of narcotics across the international border. Therefore, as in *Edmond*, at an interior border checkpoint, the detection of narcotics is a general crime control interest, which is a lesser governmental interest than the detection of illegal immigration. In other words, for purposes of the Fourth Amendment analysis, this case does not involve any governmental "special needs," as that phrase was used in *Edmond*.

{68} Of course, the conclusion that there is a lesser governmental interest at stake in this case, the general interest in crime control, does not necessarily mean that the Fourth Amendment requires reasonable suspicion. "In delineating the constitutional safeguards applicable in particular contexts, the Court has weighed the public interest against the Fourth Amendment interest of the individual." *Martinez–Fuerte*, 428 U.S. at 555, 96 S.Ct. 3074. Because the Fourth Amendment permits a fixed border checkpoint a reasonable distance within the United States for the purpose of detecting illegal immigration, individuals at an interior checkpoint will have already been legitimately stopped. The individual interest, then, is not the broader " 'right to free passage without interruption,' " *Martinez–Fuerte*, 428 U.S. at 557–58, 96 S.Ct. 3074 (quoting *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925)), but the more narrow freedom from an extended detention unsupported by individualized suspicion. Under these circumstances, I agree with the Tenth Circuit that routine questioning can include a brief and limited inquiry into an individual's destination, travel plans, vehicle ownership, and cargo, as long as the questions remain routine and are circumscribed so as to ensure an extremely brief detention. *See Chavira*, 9 F.3d at 889. Although not all of these questions directly relate to illegal immigration and tend to relate more to narcotics, the additional intrusion over the initial stop is sufficiently minimal that it does not implicate the Fourth Amendment.

{69} Once this highly abbreviated questioning has been completed, however, I believe the detention rises to the level of requiring reasonable suspicion under the Fourth Amendment. If an officer persists in asking questions beyond those specifically listed above or to follow up on questions already asked, the length of the detention would necessarily increase. In addition, the subjective intrusion that the Supreme Court described in *Martinez–Fuerte* as minimal at fixed checkpoints would undoubtedly be heightened by the implicit message sent to the individual that the agent distrusts or is suspicious of the answers given to the routine questions. This is especially true of a referral to a secondary area as in this case because, unlike *Martinez–Fuerte*, the referral to secondary is not a routine matter. For the individual, a referral to a secondary area after initial questioning, as opposed to the referral for the purpose of routine questioning in *Martinez–Fuerte*, would undoubtedly cause a heightened level of "concern or even fright on the part of lawful travelers" that was not considered by the Court in *Martinez–Fuerte*.

{70} Also, the more questions an agent is permitted to ask, the greater the potential for abusive "discretionary enforcement activity." *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. 3074; *accord Galindo–Gonzales,* 142 F.3d at 1221. If an agent is permitted to extend a detention due solely to suspicious circumstances relating to narcotics, there would be no check on the agent's ability to extend the detention indefinitely based only on the "generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Edmond,* 121 S.Ct. at 455. Suspicious circumstances would lead to questions beyond a routine inquiry, the answers to which could raise entirely new suspicious circumstances, thereby justifying even further detention. This form of prolonged questioning can only be described as an extended detention, and it would take place without the need for any reasonable suspicion of criminal activity. Finally, to expand routine questioning to include inquiry into any potential suspicious circumstances beyond the brief initial questions would make the "potential interference with legitimate traffic" more than just the minimal interference contemplated by the Court in *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. 3074.

{71} Thus, prolonged questioning most certainly goes beyond "the type of stops described in" *Martinez–Fuerte.* Just as the Supreme Court determined that it was necessary to draw a line in *Edmond* "to prevent such intrusions from becoming a routine part of American life," I believe that the line requiring reasonable suspicion must be drawn at border checkpoints once the initial routine inquiry has been completed and the purpose of detecting illegal immigration has been satisfied. I agree with the Tenth Circuit that border patrol agents are not required to ignore evidence of criminal activity, *see Ludlow,* 992 F.2d at 264 n. 3, but I believe that the heightened detention necessary to inquire into "suspicious circumstances" relating to narcotics, as with any detention related to a general interest in crime control, is subject to the Fourth Amendment norm of reasonable suspicion and, therefore, the evidence of criminal activity must be sufficient to meet that standard.

{72} I would emphasize that this is not a subjective inquiry. *See Barnett,* 935 F.2d at 181 (stating that the limitation of *Martinez–Fuerte* to immigration-related stops "does not mandate an inquiry into the subjective purpose of the agent making referrals to secondary inspection, unless there is some objective evidence supporting the charge of pretext"). It does not matter for purposes of the Fourth Amendment whether the agent who refers an individual to secondary acts on a subjective hunch about narcotics or about some other matter. Once the purpose of the checkpoint is satisfied and routine questioning has been completed, then, objectively speaking, any further detention necessarily enlarges the scope of the seizure beyond illegal immigration. *Cf. Edmond,* 121 S.Ct. at 456 ("[P]rogrammatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion.").

{73} In light of the Supreme Court's cautionary language in *Edmond* that fixed checkpoints are an extremely limited exception to the rule of particularized suspicion, I am unwilling to take the step that the Circuit Courts of Appeals have taken, and that the majority takes in this case, to expand *Martinez–Fuerte* beyond its explicit language to include an extended detention for the purpose of detecting illegal narcotics possession. *See Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. 3074 ("[O]ur holding today is limited to the type of stops described in this opinion."). Therefore, consistent with our Court of Appeals' analysis in *Estrada,* I would interpret the Fourth Amendment to require reasonable suspicion of criminal activity at a fixed border checkpoint in order to justify further detention once the purpose of detecting illegal immigration has been satisfied and once routine questioning has been completed. *See Martinez–Fuerte,* 428 U.S. at 566–67, 96 S.Ct. 3074 ("The principle protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.").

{74} In this case, Agent Arredondo completed his initial brief questioning and visual

inspection necessary to ensure that Defendant was legally within the United States and was not engaged in the smuggling of illegal aliens. Agent Arredondo asked routine questions about Defendant's destination, and Defendant answered those questions. Agent Arredondo then ordered Defendant to the secondary area. Thus, as an objective matter, Defendant's seizure was transformed from one of extremely brief duration concerning the substantial federal interest of illegal immigration for which reasonable suspicion is not required into one "whose primary purpose [was] the discovery and interdiction of illegal narcotics." *Edmond,* 121 S.Ct. at 450. The Fourth Amendment to the United States Constitution requires that such an extended detention to detect evidence of ordinary criminal wrongdoing be supported by individualized suspicion based on specific articulable facts. *See Estrada,* 111 N.M. at 800, 810 P.2d at 819 ("At the checkpoint involved in this case, the routine questioning and inspection were accomplished at the primary area instead of the secondary area. For that reason, the referral to the secondary area ... was equivalent to the 'further detention' referred to in [*Martinez–Fuerte*] and had to be based on sufficient particularized suspicion."). This standard was not met in the present case. Agent Arredondo's hunch and the general governmental crime control interest in detecting illegal drugs are insufficient to justify the further detention and heightened intrusion on Defendant's Fourth Amendment rights caused by ordering Defendant to the secondary area. As a result, because the referral to secondary violated the Fourth Amendment, Defendant's consent is invalid, and the evidence obtained in the search should have been suppressed.

{75} Although I believe this case is resolved under the Fourth Amendment, I believe a few remarks about the state constitutional analysis in the majority opinion are in order. I feel obligated to first say that I have no doubt that Article II, Section 10 of the New Mexico Constitution prevents government agents at a fixed checkpoint from arbitrarily extending a seizure by referring an individual to a secondary area without individualized suspicion after having completed routine questioning at a primary area.

However, because this case involves a federal border checkpoint, I believe that it raises highly complex questions of federalism, questions that have caused me a great deal of ambivalence. The area of border patrol searches, even when conducted some distance inside the State of New Mexico, seems to implicate the uniquely federal concern of illegal immigration. *See United States v. Martinez–Fuerte,* 428 U.S. 543, 562 n. 15, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (discussing the reasonableness of checkpoints located within a limited distance of the border). It seems to me that state courts would do well to tread lightly in evaluating under state constitutions the actions of federal agents at border checkpoints.

{76} The majority holds that a federal border patrol agent who conducts an unreasonable search and seizure sixty miles within the state of New Mexico violates Article II, Section 10 of the New Mexico Constitution. *See Majority Opinion* ¶¶ 1, 18, 21 ("We therefore hold that Agent Arredondo violated the New Mexico Constitution when he prolonged Defendant's detention without reasonable suspicion."). Respectfully, I have some doubt as to whether New Mexico has the authority to deem a search conducted by federal agents at a federal checkpoint for federal purposes pursuant to and in compliance with federal law to be illegal under the New Mexico Constitution. As expressed by Justice Baca, I believe that the majority's analysis implicates the Supremacy Clause of the United States Constitution. Because the federal officers in this case were acting pursuant to federal law, I am concerned that the holding by the majority might conflict with the pronouncement in the United States Constitution that the laws of the United States are supreme and that "the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI. This Court is obligated to defer to the duly enacted, valid laws of Congress as implemented by the executive branch of the federal government as long as that implementation complies with the provisions of the United States Constitution. By concluding that the federal agents acted "unreasonably,"

thereby committing an "'unwarranted governmental intrusion,'" the majority fails to give deference to the federal laws that are, as a matter of our federalist system, superior to our Constitution. *See* N.M. Const. art. II, § 1 ("The state of New Mexico is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land."). Moreover, the practical effect of imposing stricter requirements on federal agents may be the routine prosecution of New Mexico citizens in federal courts instead of our state courts, which will not only render the added protections afforded by the New Mexico Constitution ineffectual but also subject these individuals to potentially more severe sanctions. The majority's application of Article II, Section 10 to federal agents, while at the same time acknowledging federal supremacy, also has the disconcerting effect of "encourag[ing]" federal officers to violate the New Mexico Constitution. *Majority Opinion* ¶ 19. Ultimately, I believe that the application of state constitutional requirements to federal agents acting pursuant to federal law is an important and burgeoning area of law on which state courts would welcome guidance by the United States Supreme Court concerning the scope of the Supremacy Clause.

{77} If the majority's analysis is inconsistent with the Supremacy Clause, then the question arises whether the evidence should still be suppressed under the exclusionary rule inherent in Article II, Section 10 of the New Mexico Constitution. The Court of Appeals has held that the exclusionary rule applies to evidence sought to be admitted in state court that was obtained by federal border agents even though the Court did not hold, as the majority holds in this case, that state constitutional protections apply to the actions of federal agents. *Snyder*, 1998–NMCA–166, ¶ 18, 126 N.M. 168, 967 P.2d 843; *accord Davis*, 834 P.2d at 1012 [*Davis II*]. Nevertheless, I disagree with the Court of Appeals' analysis of the exclusionary rule in *Snyder* because I believe it is inconsistent with this Court's discussion in *Gutierrez*. I believe that the exclusionary rule applies only if there has been an actual, rather than a hypothetical, violation of the New Mexico Constitution.

{78} In *Gutierrez*, this Court explained that the exclusionary rule advances the principles of judicial integrity and deterrence, but those principles do not constitute the core purpose of the rule. 116 N.M. at 445–447, 863 P.2d at 1066–68. The focus of the exclusionary rule "is to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." *Id.* at 446, 863 P.2d at 1067. We effectuate the constitutional right by "deny[ing] the government the use of evidence obtained pursuant to an *unlawful* search." *Id.* at 445, 863 P.2d at 1066 (emphasis added). Thus, the need to apply the exclusionary rule, the constitutional trigger, is an unlawful search in violation of the accused's rights.

{79} In formulating this interpretation of the exclusionary rule in *Gutierrez*, we found "most persuasive" the reasoning of the court in *United States v. Mounday*, 208 F. 186 (D.Kan.1913). *Gutierrez*, 116 N.M. at 444, 863 P.2d at 1065. "[S]hall this court wink at the unlawful manner in which the government secured the proofs now desired to be used, and condone the wrong done defendants by the ruthless invasion of their constitutional rights, and become a party to the wrongful act by permitting the use of the fruits of such act?" *Gutierrez*, 116 N.M. at 445, 863 P.2d at 1066 (quoting *Mounday*, 208 F. at 189). We determined in *Gutierrez* that the reasoning of *Mounday* "suggest[ed] the essential core of our interpretation of Article II, Section 10." *Gutierrez*, 116 N.M. at 445, 863 P.2d at 1066. As the quotation from *Mounday* indicates, and as explicitly stated in *Gutierrez*, the core concern of the exclusionary rule, beyond deterrence and judicial integrity, is the illegal intrusion on the defendant's rights. We explained in *Gutierrez* that "[d]enying the government the fruits of unconstitutional conduct at trial best effectuates the constitutional proscription of unreasonable searches and seizures by preserving the rights of the accused *to the same extent as if the government's officers had stayed within the law*." *Gutierrez*, 116 N.M. at 446, 863 P.2d at 1067 (emphasis added).

{80} Assuming the New Mexico Constitution's protection against unreasonable

searches and seizures does not apply to federal agents at a border patrol checkpoint based on the Supremacy Clause and that the federal agents comply with the federal Constitution, there would be no unlawful governmental conduct to redress through the exclusionary rule. Applying the exclusionary rule would not "preserve the rights of the accused to the same extent as if the government's officers had stayed within the law," because the government officers would have in fact stayed within the law, both within the meaning of federal law and under Article II, Section 1 of the New Mexico Constitution. There would be no "ruthless invasion," "wrongful act," or illegal governmental conduct to fear condoning or to which we would become a party by allowing admission of the evidence. Article II, Section 10 proscribes unreasonable searches and seizures; it does not proscribe searches and seizures that would be unreasonable if they had been conducted by a different sovereign subject to different constitutional restrictions. In short, the purpose of the exclusionary rule is to effectuate an actual right, not a hypothetical one. We stated in *Gutierrez* that "[o]ne wrong plus another does not make a right," in the sense of a just result. 116 N.M. at 445, 863 P.2d at 1066 (quoted authority omitted). By the same token, the absence of a wrong does not create a right, in the sense of a constitutional protection. If the evidence was obtained in compliance with the federal Constitution and if the Supremacy Clause prevents our application of Article II, Section 10 to federal agents acting at a border checkpoint, then none of the purposes served by our exclusionary rule would be advanced by suppressing the evidence.

{81} Nevertheless, as I have indicated, I believe it is unnecessary to resolve these difficult questions involving the New Mexico Constitution due to our interstitial approach to state constitutional law. I conclude that the extended detention in this case violated the Fourth Amendment. I therefore concur in the result of affirming the Court of Appeals.